**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS COUNTY DIVISION**

| | |
|---|---|
| LEMKO CORPORATION, an Illinois Corporation,<br><br>Plaintiff,<br>vs.<br><br>MICROSOFT CORPORATION, a Washington Corporation, and AFFIRMED NETWORKS, INC., a Delaware Corporation,<br><br>Defendants. | Case No.: 3:22-cv-363<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Lemko Corporation ("Lemko") files this Complaint for Patent Infringement and Demand for Jury Trial against Microsoft Corporation and Affirmed Networks, Inc. (collectively "Defendants") and alleges as follows:

## THE PARTIES

1. Lemko is an Illinois corporation, with its principal place of business at 846 East Algonquin Road, Suite #101, Schaumburg, IL 60173.

2. Founded in 2004, Lemko provides a leading, fully edge-capable mobile network platform and resilient 4G/5G wireless networks for use in Industrial Internet of Things ("IoT") applications, private 4G/5G networks, wireless rural broadband systems, and military and public safety deployments.

3. Microsoft Corporation ("Microsoft") is a Washington corporation. Microsoft may be served through its agent for service of process, CSC Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

4. Affirmed Networks, Inc. ("Affirmed Networks") is a Delaware corporation. Affirmed Networks may be served through its agent for service of process, CSC Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

5. Microsoft acquired Affirmed Networks in 2020, and Affirmed Networks is now a wholly-owned subsidiary of Microsoft. Microsoft and Affirmed Networks variously developed the Accused Products (defined below).

## JURISDICTION AND VENUE

6. This action for patent infringement arises under the patent laws of the United States, 35 U.S.C. § 101 *et seq.* This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1338.

7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

8. The Court has personal jurisdiction over Microsoft because Microsoft has continuous and systematic contacts with this District. Microsoft Corporation maintains an office in this District at 7000 and 7100 State Highway 161, Building LC1 & LC2, Irving, Texas 75039. On information and belief, this office is a regular and established place of business.

9. The Court has personal jurisdiction over Affirmed Networks because Affirmed Networks has continuous and systematic contacts with this District. Affirmed Networks maintains an office in this District at 2280 Campbell Creek Boulevard, Suite # 325, Richardson, TX 75082. On information and belief, this office is a regular and established place of business. Affirmed Networks is also actively hiring employees for multiple positions based in Dallas. Exhibit 1 (https://careers.microsoft.com/us/en/search-results?keywords=%23Affirmednetworks).

10. Additionally, the Court has personal jurisdiction over Defendants in this action because Defendants have committed acts of direct and indirect infringement in this District, including through selling and offering for sale infringing products and services in this District, because Lemko's claims arise out of and relate to Defendants' acts of infringement in this District, and because the exercise of jurisdiction by the Court over Defendants in this action would be reasonable and would not offend traditional notions of fair play and substantial justice given Defendants' persistent presence and contact with this District.

## LEMKO'S INNOVATIONS AND ASSERTED PATENTS

11. Based in Schaumburg, Illinois, Lemko has developed commercial networks using CDMA, 2G, 3G, 4G, and 5G technologies.

12. In 2004, Lemko began offering multi-access edge computing ("MEC") products and services. MEC refers to locating computing of traffic and services closer to the customer (the "edge" of a network) as opposed to locating that computing functionality in remote servers (the "cloud"). Lemko's MEC products and services allow local mobile devices to communicate through an edge server without connecting through a regional call center, improving performance and reducing costs.

13. The United States Patent and Trademark Office ("USPTO") awarded to Lemko patents covering solutions for providing MEC networks and other improvements in communications technology and the underlying infrastructure.

14. On June 16, 2009, the USPTO issued U.S. Patent No. 7,548,763 (the "'763 Patent"), entitled "System, Method, and Device for Providing Communications Using a Distributed Mobile Architecture." The '763 Patent identifies Shaowei Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 2 is a true and correct copy of the '763 Patent.

15. The ’763 Patent generally discloses providing for group communications between participants, where each participant communicates with a base transceiver station controller coupled to a distributed mobile architecture (“DMA”) server. The DMA servers may be configured to permit duplex communications capabilities between participants.

16. On January 26, 2010, the USPTO issued U.S. Patent No. 7,653,414 (the “’414 Patent”), entitled “System, Method, and Device for Providing Communications Using a Distributed Mobile Architecture.” The ’414 Patent identifies Shaowei Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 3 is a true and correct copy of the ’414 Patent.

17. The ’414 Patent generally discloses a DMA system that includes an authentication, authorization, and accounting (“AAA”) module with a destination preference register, which includes a preferred path for communications to be routed outside of a DMA network accessible to the DMA system.

18. On December 21, 2010, the USPTO issued U.S. Patent No. 7,855,988 (the “’988 Patent”), entitled “System, Method, and Device for Routing Calls Using a Distributed Mobile Architecture.” The ’988 Patent identifies Shaowei Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 4 is a true and correct copy of the ’988 Patent.

19. The ’988 Patent generally discloses network communications systems for routing communications between distributed mobile architecture servers using DMA gateways (“DMAGs”) where communications information indicates one or more devices accessible by one of a DMA server and a legacy communications network. Communication information is received at a first DMAG for a communications network accessible by a second DMAG.

20. On January 31, 2012, the USPTO issued U.S. Patent No. 8,107,409 (the "'409 Patent"), entitled "OAMP for Distributed Mobile Architecture." The '409 Patent identifies Shaowei Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 5 is a true and correct copy of the '409 Patent.

21. The '409 Patent generally discloses a DMAG that routes communications to DMA nodes and to roaming DMA nodes, including communications received from a legacy network, and to DMA nodes that can send performance data to a home DMAG and to a visitor DMAG.

22. On April 1, 2014, the USPTO issued U.S. Patent No. 8,688,111 (the "'111 Patent"), entitled "System, Method, and Device for Providing Communications Using a Distributed Mobile Architecture." The '111 Patent identifies Shaowei Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 6 is a true and correct copy of the '111 Patent.

23. The '111 Patent generally discloses receiving at a first DMA system, communications from a first mobile device directed to a second mobile device, and determining whether the second mobile device is registered with one of the first DMA system and a second DMA system based on information stored at an AAA module.

24. On November 17, 2015, the USPTO issued U.S. Patent No. 9,191,980 (the "'980 Patent"), entitled "System and Method to Control Wireless Communications." The '980 Patent identifies Shaowei Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 7 is a true and correct copy of the '980 Patent.

25. The '980 Patent generally discloses controlling wireless communications when communications are associated with a destination device and received from a first mobile

device at a base transceiver station ("BTS") interface of a first DMA server to determine if a first DMAG supports communications with the destination device based on registration data stored at the first DMA server.

26. On May 3, 2016, the USPTO issued U.S. Patent No. 9,332,478 (the "'478 Patent"), entitled "System, Method, and Device for Routing Calls Using a Distributed Mobile Architecture." The '478 Patent identifies Shaowei Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 8 is a true and correct copy of the '478 Patent.

27. The '478 Patent generally discloses transmitting communications information from a first DMAG to a second DMAG in a DMAG communication network, where the information is associated with a communication network accessible by the first DMAG, and receiving a communication from the second DMAG via the DMAG communication network.

28. On September 5, 2017, the USPTO issued U.S. Patent No. 9,755,931 (the "'931 Patent"), entitled "Fault Tolerant Distributed Mobile Architecture." The '931 Patent identifies Shaowei Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 9 is a true and correct copy of the '931 Patent.

29. The '931 Patent generally discloses detecting a failure condition relating to a first DMAG at a DMAG management system in communication with at least the first DMAG, a second DMAG, and DMA nodes, and determining if a first DMAG is offline based on a failure condition, selecting the second DMAG, sending a first notification from the DMAG management system to the second DMAG, and sending a second notification from the DMAG management system to an external system configured to connect calls to a mobile station via the first DMAG.

30. The ’763, ‘414, ‘988, ‘409, ‘111, ’980, ‘478, and ‘931 Patents are collectively referred to herein as the “Asserted Patents.”

31. The Asserted Patents are not abstract and specifically claim inventive concepts that represent significant improvements over conventional networking technology. Specifically, each of the Asserted Patents describes various hardware architectures with a variety of connection techniques that can be used with mobile device technology, particularly in edge-networks.

32. For example, each of the Asserted Patents solves problems relating to different aspects of determining if a mobile device is registered with a specific DMA or is roaming and should be connected to a different home DMA, interconnecting DMA networks with legacy communication networks so that mobile devices can seamlessly communicate with both local DMAs and non-local legacy networks, locally routing data to devices where possible instead of using backhaul to a non-local network, interconnecting DMA gateways to appropriately route communications to destination devices, and detecting and responding to network failure conditions.

33. The technology disclosed in the Asserted Patents was not available in the art at the time of the inventions because conventional networking systems did not provide such functionality, and did not provide the specific solutions using the specific components set forth in the claims of the Asserted Patents. To the contrary, then-conventional technology was based on a different paradigm that sought to either have a network that was entirely local or to have a network where the data storage and computational power was located in the cloud, rather than at the edge of the network.

34. The Asserted Patents disclose more than just a simple combination of generic components to perform conventional activities. The Asserted Patents improve networking systems, especially for use in edge networks, and solve specific problems with edge networks variously using new components in an unconventional manner. For example, the claims of the Asserted Patents variously recite DMA servers, DMA gateways, and networking flows that were not conventional at the time of the inventions.

35. For example, certain claims of the Asserted Patents variously recite: a DMA gateway with an interface to communicate with a legacy communication network, a home DMA register with a list of DMA nodes and designated routes for communication with mobile devices, a visitor DMA register with a list of DMA nodes that are roaming with respect to the DMA gateway and the DMA gateway being able to route calls to mobile devices served by the roaming DMA nodes, a master agent that receives performance data from the DMA nodes, and an operations module that stores the performance data, and sends the performance data to DMA gateways. Other claims of the Asserted Patents ascribe other specific and non-conventional functions and networking requirements on DMA servers and DMA gateways.

36. In addition, the claims are rooted in computer technology as they are directed to specific hardware architectures with different applications that improve the communications of and between mobile devices and the infrastructure supporting such devices. Thus, the claims of the Asserted Patents recite specific steps and components to accomplish the desired results and go beyond simply claiming a result. Accordingly, the inventions of the Asserted Patents allow for a new kind of infrastructure and communications network that was not previously possible.

37. Lemko has marked and continues to mark its patent-practicing products with stickers identifying the applicable patents and identified and continues to identify the applicable patents in the documentation for its software products.

38. On information and belief, Defendants know of the Asserted Patents and that Defendants' Accused Products (defined below) infringe the Asserted Patents from their awareness of Lemko's patent-marked products, which compete with the Accused Products.

39. On information and belief, Defendants are also aware of the Asserted Patents through Martin Taylor, who is in Microsoft's Office of the CTO, Azure for Operators, and in Microsoft's Program Management, Azure for Operators. In the 2010 to 2012 timeframe, Mr. Taylor was the CTO of Metaswitch Networks. During that time, Mr. Taylor and others at Metaswitch discussed a potential partnership with Lemko, evaluated Lemko's technology, and participated in meetings with Lemko, and Lemko informed them that Lemko had obtained patents and was pursuing additional patents covering its inventions. Mr. Taylor remained with Metaswitch Networks until Microsoft acquired it in July 2020. On information and belief, Mr. Taylor is directly involved in the Accused Products discussed below.

## DEFENDANTS' INFRINGING PRODUCTS

40. Defendants make, use, sell, offer for sale, and/or import into the United States and this District products and services that infringe the Asserted Patents (the "Accused Products"), including a combination of the Azure Stack Edge and Virtual Evolved Packet Core (collectively, the "Core MEC Products"). Exhibit 10; Exhibit 11 at 1.

41. Defendants' Azure Stack Edge ("ASE") are servers and related services for managing devices from the cloud with Azure management tools. Exhibit 12 at 1. ASE products include the ASE Pro Series (Pro and Pro R) and the ASE Mini Series servers. These servers run applications at the edge. Exhibit 13 at 1.



Exhibit 12 at 5-6 (showing Azure Management Portal for controlling ASE).




Exhibit 14 at 1 (showing location of ASE servers at the edge of a network).

42. Defendants' Virtual Evolved Packet Core ("vEPC") is software for managing and controlling networks. vEPC delivers advanced network capabilities to deploy a complete 5G non-standalone architecture ("NSA") network: Control/User Plan Separation ("CUPS"), network slicing, service automation, and virtualized, cloud-native network functions. Exhibit 11 at 1. vEPC is built on virtualization, personalization, disaggregation, and operational insight, which allow users to create new services, scale network capacity, and generate analytics-driven insights. *Id.*




Figure 1. Affirmed Virtual Evolved Packet Core (vEPC) Components

Exhibit 11 at 3 (schematic diagram of vEPC).

43. Defendants sell ASE in combination with vEPC.




Exhibit 15 at 1 (showing vEPC operating in combination with Azure Stack Edge).




Exhibit 16 at 2 (showing Defendants' marketing of ASE in combination with vEPC).

44. In addition to the Core MEC Products, Defendants offer additional infringing products and technologies, which are summarized below. These products and technologies extend the Core MEC Products, and include Azure Network Function Manager, Affirmed Cloud Edge, Affirmed Virtual Probe & Analytics, and Affirmed Private Network Service (with its Manager and Network Slicing technologies).

45. Azure Network Function Manager enables customers to deploy and provision network functions on ASE servers using the Azure portal, such as mobile packet core and virtual private network ("VPN") functions. *Id.*

46. Virtual Probe & Analytics ("vProbe") provides probe/packet brokering functions for and is integrated into vEPC. Exhibit 17 at 2; Exhibit 18 at 1.




*Figure 1. Affirmed Active Intelligent vProbe*

Exhibit 18 at 1.

47. Affirmed Cloud Edge ("ACE") for MEC hosts applications and keeps data local on customers' premises to minimize latency. Exhibit 19 at 1. ACE can be deployed at the edge of the mobile operator's network or used as part of the ACE. *Id*. ACE's capabilities include 3rd Generation Partnership Project ("3GPP") compliant control and user plane separation (CUPS) architecture, edge breakout functionality, affirmed provisioning portal, and automated service provisioning and creation. *Id*. at 4-5.




Exhibit 19 at 4.

48. Defendants' Affirmed Private Network Service ("APNS") consists of vEPC, Affirmed Service Manager, ASE, and Azure Network Function Manager. Exhibit 20 at 3. Defendants manage and provide APNS as a private network solution that enables mobile network operators and managed service providers ("MSPs") to deliver private LTE/5G network services to enterprise customers. Exhibit 21 at 1.




Exhibit 20 at 3.

49. Defendants' APNS Manger deploys, monitors, and manages private mobile core networks on Azure. Exhibit 16 at 1. APNS Manager provides automation and orchestration capabilities through a cloud management portal that allows MSPs to deploy services for private networks. Exhibit 21 at 8.




Exhibit 16 at 2.

50. Defendants' Network Slicing technologies allow multiple enterprises to host private networks on the same physical infrastructure. Exhibit 22 at 1. Defendants' Virtual Slice Selection Function ("vSSF") enables network slicing across legacy, virtualized and multi-vendor environments. *Id*. vSSF provides slicing of network resources enabling mobile operators to segment traffic and direct it to network slices optimized for the services. Exhibit 23 at 2.




*Id.* at 1.




*Id.* at 4.

**COUNT I**
**(Direct Infringement of the ’763 Patent)**

51. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

52. Defendants have infringed and continue to infringe the ’763 Patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States the Accused Products.

53. Defendants’ infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

54. Defendants’ acts of making, using, importing, selling, and offering for sale the Accused Products have been without the permission, consent, authorization, or license of Lemko.

55. To the extent any components of the claimed systems are provided by Defendants’ customers, Defendants directly infringe by acting as the final assembler of the infringing system.

56. To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the Accused Products. Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the Accused Products as a combination and provide services to manage and configure the Accused Products as a combination. Moreover, Defendants jointly control and put into service the Accused Products.

57. Defendants further directly infringe by directing and controlling the infringing systems, and obtain benefits from their control of the systems as a whole, for example, when Defendants configure and maintain the infringing systems as a service for their customers.

58. Defendants' infringement includes, but is not limited to, the manufacture, use, sale, importation and offer for sale of the Core MEC Products and ACE (collectively, the "'763 Accused Products").

59. The '763 Accused Products provide first and second DMA servers with computer-readable medium, including ACE-C and ACE-U gateway functions, as shown below.




Exhibit 19 at 4 (showing ACE-C and ACE-U gateway functions).

60. The '763 Accused Products provide MEC solutions that combine mobile core (communications system) and a server. It "start[s] with a virtualized architecture, one that allows you to deliver telco-grade mobile core performance at the edge in a lightweight design." Exhibit 24 at 2.

61. vEPC provides a mobile switching center module. The MEC platform "partner[s] with technology innovators to provide mobile virtual network functions (Evolved

Packet Core), device integration, SIM management, and radio access networks." Exhibit 56 at 13-14. MEC is "managed from Azure." *Id*. at 14.




Microsoft Azure private multi-access edge compute (MEC) Overview.mp4, at 9:07 (showing MEC partners) (https://docs.microsoft.com/en-us/shows/inside-azure-for-it/azure-private-multi-access-edge-compute-mec-overview).

62. vEPC includes a mobile switching center module by using a steering feature which provides preferred call paths for calls to be routed outside of a DMA network accessible to the DMA system.

## Steering

Steering allows the normal routing of a packet to be overridden for upstream subscriber traffic based on the configured steering-policy.

Steering allows upstream subscriber traffic to be force-routed to a specific next hop or into a specific tunnel. Steering is compatible with NAT, as an upstream packet can be source NAT'd and steered. Steering is subservient to the HTTP proxy and its dependent services, in other words, if the packet is to be proxied, steering is ignored.

Steering can be based on any of the inputs present on the service-rule:

- L3/4 packet-filter
- time-of-day-rule-group
- DPI application-rule-group
- L7 http-rule-group

***Note:*** *The steering service does not support steering into IPSEC tunnels.*

## Steering Flow

The Layer 3 steering-flow allows for upstream subscriber traffic steering. You can link a service-rule(s) to the steering-flow to specify the actions to take on traffic that matches at least one of its service-rules.

*action* – When the action is set to steering, Operators can specify the network-context and the name of the tunnel or next-hop on which upstream traffic will be sent.

*priority* – The priority is used to resolve conflicts in the case of multiple steering-flows. The priority is hierarchical. In other words, the priority of the higher-level object takes precedence over the lower-level object. Select a priority between 1 and 4096. The default is 100.

Exhibit 25 at 218.

63. Another steering example is the steering of all uplink and downlink video traffic for a particular content site to either an internal/external video optimization or video caching service.

**Figure 10-1 Workflow**




Exhibit 25 at 326.

64. vEPC's Access and Mobility Management Function acts as a base station controller for 5G, and Mobility Management Entity ("MME") functions as a base station controller for 4G.




Exhibit 26 at 3.

65. The vEPC provides Call Detail Record (CDR) functions and is supported by the accounting portion of the vEPC's AAA function. Furthermore, the Serving General Packet Radio Service ("GPRS") Support Node ("SGSN") function in the vEPC supports "generation of SGSN (S-CDR) and Mobility (M-CDR) records as well as SMO (SMS mobile originated) and SMT {SMS mobile terminated) records for account purposes." Exhibit 27 at 103.

**5.2.6.2 Transfer by SFTP Pull**

The following procedure describes how to pull billing records (CDRs) that have been stored to disk in 3GPP TS 32.297 compliant format from the SGSN.

Note that only SFTP Pull is supported. FTP is not supported.

Exhibit 27 at 105 (describing functionality for pulling CDR billing records).

66. The MEC server is directly connected to a wireless transceiver at the edge of the network. The second DMA server is also directly connected to a wireless transceiver.




Exhibit 19 at 4.

67. The edge service is deployed on premise on ASE connected to a transceiver station, as shown below.




Exhibit 28 at 3.

68. vEPC provides 3rd Generation Partnership Project ("3GPP") compliant functionality, which includes group communications among four or more mobile communication devices. vEPC is a "runs on a single, virtual network function (VNF) instance." Exhibit 29 at 1.

69. In addition, the vEPC provides Voice over Long Term Evolution ("VoLTE") services supported on the Packet Data Network Gateway ("PGW") and Serving Gateway ("SGW"), allowing for group communications among multiple concurrent sessions. Exhibit 25 at 152-53.

70. The vEPC's VoLTE functionality supports emergency call handling on SGW and PGW for group emergency communications among multiple mobile devices, by establishing a dedicated bearer for the emergency communications or emergency communications session using the International Mobile Equipment Identity ("IMEI") of the mobile devices. Exhibit 25 at 154.

71. The second DMA server (the server including the MME and the ACE) is in direct physical connection with a wireless transceiver via an "S1-MME" connection. Exhibit 19 at 4.

72. The telephony traffic received at the first wireless transceiver (via an "S1u" Data Plane connection) is transmitted from a first DMA server included in the ACE to a second DMA server via a peer-to-peer connection (the "S5/S8-U" connection between the "ACE-U" and "ACE-C").



Exhibit 19 at 4.

73. The S5/S8-U connection between the ACE-U (SGW) and ACE-C (PGW) is a peer-to-peer connection between GPRS Tunneling Protocol ("GTP") peers: SGW and PGW, as shown above.

**Classification Based on GTP Configuration**

If the GTP peer is configured, the GTP peer is classified as local or remote based on the configuration. The interface to the peer is classified as S5/S8 or Gn/Gp as follows:

| GW Type | GTP Peer | Interface Classification |
|---|---|---|
| SGW | Local PGW | S5 |
| SGW | Remote PGW | S8 |
| PGW | Local SGW | S5 |
| PGW | Remote SGW | S8 |
| GGSN | Local SGSN | Gn |
| GGSN | Remote SNGS | Gp |

Exhibit 25 at 172. The operators can "configure GTP peers and associate that peer with any of the gateway objects." Exhibit 25 at 174. A peer is identified by its IP address, Network Context ID, and the version of the GTP-C protocol that it supports. *Id.*

## GTP Peers

Operators can configure GTP peers and associate that peer with any of the gateway objects. A peer is identified by its IP address, Network Context ID, and the version of the GTP-C protocol it supports. A peer can be associated only with a gateway instance whose GTP-C endpoint address is in the same network context as the peer. Operators can configure the number of times the GW transmits a message if no acknowledgement is received.

*Id.*

74. vEPC supports the capability for the GTP-C protocol to "transport over both IPv4 and IPv6, including the simultaneous assignment of IPv4 and IPv6 addresses for the peer to use." Exhibit 25 at 173.

75. Defendants' infringement of the '763 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

76. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT II**
**(Indirect Infringement of the '763 Patent)**

77. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

78. Defendants know about the '763 Patent and that the Accused Products infringe the '763 Patent, at least from their receipt of this Complaint, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

79. In addition to directly infringing the '763 Patent, as discussed above, Defendants have induced infringement of the '763 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least Claim 1.

80. Defendants knowingly and actively aided and abetted the direct infringement of the '763 Patent by instructing and encouraging their customers to use and install the Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines,

videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the Accused Products.

81. For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '763 Accused Products in an infringing manner (as described above). Exhibit 30 (https://azure.microsoft.com/en-us/support/community/). Azure Community Support covers in-depth installing and configuring the '763 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '763 Accused Products' mobile edge computing and services features.

82. Defendants also published numerous white papers that explain and identify the Accused Products as working in the infringing manner and being configured in the infringing manner described above. *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/). Defendants provide product blog posts that cover the Accused Products' infringing features and instruct customers on how to configure and use the Accused Products in an infringing manner. Exhibit 32 (https://www.affirmednetworks.com/blog/).

83. In addition, Defendants support customers' use and configuration of the Accused Products through a dedicated support center. Exhibit 33 (https://www.affirmednetworks.com/support/).

84. Defendants are also liable for contributory infringement of the '763 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least Claim 1 by offering to sell and selling in the United States the Accused Products. The Accused Products are, at a minimum, a material component of the systems that infringe Claim 1 of the '763 Patent, and are not a staple article or

commodity of commerce suitable for substantial noninfringing use. In particular, at least as of their receipt of this Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the ‘763 Patent, as discussed above. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the ’763 Patent, including Claim 1.

85. Defendants’ indirect infringement of the ’763 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

86. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney’s fees and costs.

**COUNT III**
**(Direct Infringement of the ’414 Patent)**

87. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

88. Defendants have infringed and continue to infringe the ’414 Patent, including at least Claims 1 and 11, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States the Accused Products.

89. Defendants’ infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

90. Defendants’ acts of making, using, importing, selling, and offering for sale the Accused Products have been without the permission, consent, authorization, or license of Lemko.

91. To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.

92. To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the Accused Products. Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the Accused Products as a combination and provide services to manage and configure the Accused Products as a combination. Moreover, Defendants jointly control and put into service the Accused Products.

93. Defendants further directly infringe by directing and controlling the infringing systems and performance of the infringing methods and obtain benefits from their control of the systems and performance of the methods as a whole, for example, when Defendants configure and maintain the infringing systems as a service for their customers.

94. Defendants' infringement includes, but is not limited to, the manufacture, use, sale, importation and offer for sale of the Core MEC Products and ACE (collectively, the "'414 Accused Products").

95. The '414 Accused Products have "a virtualized architecture" to "deliver telco - grade mobile core performance at the edge in a lightweight design." Exhibit 24 at 2. Furthermore, ACE is a distributed architecture (Control and User Plane Separation) to support "high bandwidth, low latency applications and Multi-Access Edge Computing." Exhibit 19 at 4.

96. The '414 Accused Products contain a base transceiver station coupled to housing that receives communications from mobile devices, and can be "deployed in a public or private cloud, at the network edge or even on-premise at the customer's location." Exhibit 34 at 2.

97. As shown below, Defendants' edge service on ASE can be deployed on premise with a transceiver station directly coupled to a server housing.




Exhibit 28 at 3. The housing is coupled to the wireless transceiver, such as an eNodeB and Radio Access Network ("RAN"). Exhibit 35 at 5.

98. ASE provides a computer readable storage medium to "act[] as a cloud storage gateway and enables eyes-off data transfers to Azure, while retaining local access to files." Exhibit 12 at 6-7.

99. vEPC provides various functions, including AAA. Exhibit 35 at 1.

Affirmed Networks' vEPC provides high performance, scalable, cost-effective vEPC functions, including:

- Mobility Management Entity/Serving GPRS Support Node (MME/SGSN)
- Serving Gateway (SGW)
- Gateway GPRS Support Node/Packet Data Network Gateway (GGSN/PGW)
- Evolved Packet Data Gateway (ePDG)
- Trusted Wireless Access Gateway (TWAG)
- CIoT Serving Gateway Node (CSGN) – Narrow-Band IoT (NB-IoT)
- Policy and Charging Rules Function (PCRF)
- Authentication, Authorization, and Accounting (AAA)
- Home Subscriber Server (HSS)

*Id*. (showing that vEPC provides AAA functions).

100. vEPC also provides Home Subscriber Server ("HSS") functionality. Exhibit 29 at 1.




Exhibit 29 at 1 (showing inclusion of HSS/HLR module).

101. The '414 Accused Products provide a visitor location register ("VLR") that stores information associated with one or more roaming mobile devices registered with the DMA system temporarily, supporting a virtualized MME which connects to the VLR through SGs interface to register with the DMA system.

### 4.2.12 SGs to VLR

The SGs interface connects the MME to the Mobile Switching Center/Visitor Location Register (MSC/VLR), providing support for Circuit Switched Fallback to GSM or UMTS.

| Step # | Action |
|---|---|
| 1 | Configure the SCTP profile. |

```
user@host% set mme-sgsn interface sctp sctpSgs rto-initial 500 rto-min 250 rto-max 2000 path-max-retrans 2 association-init-max-transmit 2 association-max-retrans 2 no-delay true max-out-stream 1 max-in-stream 1 hb-interval 30 rx-buffer-size 149000 tx-buffer-size 149000 sack-delay 200 sack-frequency 2

user@host% show mme-sgsn interface sctp sctpSgs
rto-initial 500;
rto-min 250;
rto-max 2000;
path-max-retrans 2;
association-init-max-transmit 2;
association-max-retrans 2;
no-delay true;
max-out-stream 1;
max-in-stream 1;
hb-interval 30;
rx-buffer-size 149000;
tx-buffer-size 149000;
sack-delay 200;
sack-frequency 2;
```

Exhibit 27 at 57 (showing incorporation of VLR functionality for storing information for roaming GSM or UMTS mobile devices).

102. vEPC provides a community location register ("CLR") such as a hss-hlr routing table associated with a second HLR of a second DMA system. The International Mobile Subscriber Identity ("IMSI") of mobile devices (referred to as "User Equipment" or "UE") is associated with the HSS.

### 5.1.3 Gr/S6d HLR/HSS Interface

For a Gn-SGSN, the Gr interface to an HLR is mandatory, and S6d is not supported. For a S4-SGSN, you may chose between Gr over SIGTRAN to the HLR, S6d over DIAMETER to the HSS (potentially the same node as HLR), or both. Selection between Gr and S6d is based on IMSI range of the UE and the hss-hlr-routing table that is configured on the SGSN. A combined MME/S4-SGSN or a stand-alone S4-SGSN retrieves authentication information over the Gr interface for an EPC subscriber located in a GERAN/UTRAN coverage area, and then retrieves subscription information for the EPC capable subscriber over the S6a interface. This can be used by an operator who has an HSS deployment that does not support the S6d interface. This development also provides the flexibility to retry the authentication or subscription information over Gr interface, if the attempt to retrieve over S6 interface fails.

Exhibit 27 at 80.

103. The HSS is a second HLR because Affirmed Networks provides an S6d interface to the HSS, which is a "concatenation of the HLR and the Auc (Authentication

Center)" and "stores and updates the database containing all subscription information" for either the first or second DMA system. Exhibit 25 at 363.

104. The HSS stores information associated with one or more mobile subscriber devices registered with the second DMA system, including the following subscription information.

- User State
- E-UTRAN-Cell-Global-Identity (eCGI)
- Tracking-Area-Identity (TAI)
- Cell-Global-Identity (CGI)
- Location-Area-Identity (LAI)
- Service-Area-Identity (SAI)
- Routing-Area-Identity (RAI)
- Age of Location
- UE Time zone

Exhibit 27 at 72.

105. vEPC provides multiple destination preference registers ("DPR") for its steering feature to provide preferred call paths for calls to be routed outside of a DMA network (accessible to a first and a second DMA systems), allowing upstream subscriber traffic to be force-routed to a specific next hop or into a specific tunnel. For example, the Distribution and Replication Protocol ("DRP") used for Transmission Control Protocol ("TCP") Splicing stores TCP splicing policies for "differentiated treatment to TCP connections based on service-rule selections," such as "steer connections to a server domain." Exhibit 25 at 212. This is further demonstrated by the example call flow to access freedomain.com free of charge:

***Example Call Flow***

Operators may apply a tcp-splicing-policy to provide differentiated treatment of subscriber data, such as free of charge service, based on the destination network domain. In this case, domain-based policy rules must be configured using a tcp-spicing-policy. The following example call flow describes a use case allowing a UE to access freedomain.com free of charge.

1 The UE issues a DNS lookup for *freedomain.com*.

2 The DNS proxy on the SSM returns a local loopback ip-address [2001::AFFD:1] configured in dns static-map.

3 The UE establishes a TCP connection with the destination address [2001::AFFD:1] on port 443 to MCC.

4 MCC uses workflow to match the destination address to the service-rule in http-ip-flow and forwards the address to the http-proxy, after applying the free charging policy associated with the workflow.

5 The http-proxy matches the destination address with the tcp-splicing-policy within http-ip-flow and applies the policy containing the steering-group with *freedomain.com* in its destination-host.

6 MCC triggers a DNS lookup to obtain the real ip-address [2001::ABC1].

7 Upon a successful DNS response, MCC establishes a TCP connection to the server on port 443. Up to this point, and end-to-end communication channel was established between the UE and freedomain.com and data was spliced over the channel.

Exhibit 25 at 213.

106. Another steering example is the steering of all uplink and downlink video traffic for a particular content site to either an internal or external video optimization or video caching service.

**Figure 10-1 Workflow**




Exhibit 25 at 326.

107. Through the AAA, the end user device signals to the core site elements and receives the preferred routing to outside networks using the destination preference register, part of the function of the core site.




Exhibit 19 at 4.

108. Also through the AAA, the end user device signals to the core site elements and receives the preferred routing to direct the calls in a preferred call path stored in DRP, through instructions in the core site after determining if the device is outside the DMA network. vEPC provides a steering feature which routes calls to preferred call paths including a destination device outside of the DMA network. For example, upstream subscriber traffic is force-routed to a specific next hop or into a specific tunnel by using steering-flows to specify the actions to take on traffic matching at least one of its service-rules.

## Steering

Steering allows the normal routing of a packet to be overridden for upstream subscriber traffic based on the configured steering-policy.

Steering allows upstream subscriber traffic to be force-routed to a specific next hop or into a specific tunnel. Steering is compatible with NAT, as an upstream packet can be source NAT'd and steered. Steering is subservient to the HTTP proxy and its dependent services, in other words, if the packet is to be proxied, steering is ignored.

Steering can be based on any of the inputs present on the service-rule:

- L3/4 packet-filter
- time-of-day-rule-group
- DPI application-rule-group
- L7 http-rule-group

***Note:*** *The steering service does not support steering into IPSEC tunnels.*

## Steering Flow

The Layer 3 steering-flow allows for upstream subscriber traffic steering. You can link a service-rule(s) to the steering-flow to specify the actions to take on traffic that matches at least one of its service-rules.

*action* – When the action is set to steering, Operators can specify the network-context and the name of the tunnel or next-hop on which upstream traffic will be sent.

*priority* – The priority is used to resolve conflicts in the case of multiple steering-flows. The priority is hierarchical. In other words, the priority of the higher-level object takes precedence over the lower-level object. Select a priority between 1 and 4096. The default is 100.

Exhibit 25 at 218.

109. Steering uses the preferred call paths (data profiles) stored at the DPR to steer the associated subscriber's traffic flow to the appropriate collection of associated services. Exhibit 25 at 331.

110. Defendants' infringement of the '414 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

111. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT IV**
**(Indirect Infringement of the '414 Patent)**

112. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

113. Defendants know about the '414 Patent and that the Accused Products infringe the '414 Patent, at least from their receipt of this Complaint, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

114. In addition to directly infringing the '414 Patent, as discussed above, Defendants have induced infringement of the '414 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least Claim 11 and by performing the methods of at least Claims 1 and 8.

115. Defendants knowingly and actively aided and abetted the direct infringement of the '414 Patent by instructing and encouraging their customers, developers, and partners to use and install the Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the Accused Products.

116. For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '414 Accused Products in an infringing manner (as described above). Exhibit 30 (https://azure.microsoft.com/en-us/support/community/). Azure Community Support covers in-depth installing and configuring the '988 Accused Products, and includes tutorials, articles, support tickets, Q&A,

and exchanges of ideas regarding the '414 Accused Products' mobile edge computing and services features.

117. Defendants also published numerous white papers that explain and identify the Accused Products as working in the infringing manner and being configured in the infringing manner. *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/). Defendants provide product blog posts that cover the Accused Products' infringing features and instruct customers on how to configure and use the Accused Products in an infringing manner. Exhibit 32 (https://www.affirmednetworks.com/blog/).

118. In addition, Defendants support customers' use and configuration of the Accused Products through a dedicated support center. Exhibit 33 (https://www.affirmednetworks.com/support/).

119. Defendants are also liable for contributory infringement of the '414 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least Claim 11 by offering to sell and selling in the United States the Accused Products. The Accused Products are, at a minimum, a material component of the systems that infringe Claim 11 of the '414 Patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use. In particular, at least as of their receipt of this Complaint, Defendants know that their, as discussed above Accused Products are particularly suited to be used in a manner that infringes the '414 Patent. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '414 Patent, including Claim 11.

120. Defendants' indirect infringement of the '414 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.

Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

121. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT V**
**(Direct Infringement of the '988 Patent)**

122. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

123. Defendants have infringed and continue to infringe the '988 Patent, including at least Claims 1 and 42, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States the Accused Products.

124. Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

125. Defendants' acts of making, using, importing, selling, and offering for sale the Accused Products have been without the permission, consent, authorization, or license of Lemko.

126. To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.

127. To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the Accused Products. Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the Accused Products as a combination and provide services to manage and configure the Accused

Products as a combination. Moreover, Defendants jointly control and put into service the Accused Products.

128. Defendants further directly infringe by directing and controlling the infringing systems and performance of the infringing methods and obtain benefits from their control of the systems and performance of the methods as a whole, for example, when Defendants configure and maintain the infringing systems as a service for their customers.

129. Defendants' infringement includes, but is not limited to, the manufacture, use, sale, importation and offer for sale of the Core MEC Products, ACE, and APNS (collectively, the "'988 Accused Products").

130. The '988 Accused Products provide a network communication system. ASE is a DMA server deployed on premise with a wireless transceiver coupled to the server's housing.




Exhibit 28 at 3 (showing wireless transceiver coupled to Azure Stack Edge DMA server).

131. APNS is also a communication system that has combined its "mobile core with Microsoft Azure's capabilities to create a complete turnkey solution for private LTE/5G

networks." Exhibit 28 at 2. APNS uses ACE, a distributed architecture (as in CUPS), to support high-bandwidth, low-latency applications and MEC. Exhibit 19 at 4. APNS supports multiple deployment models to deliver mobile solutions on ASE in a distributed network. Exhibit 16 at 2.

132. APNS includes a first interface adapted to communicate with a private Internet Protocol (IP) network to "launch private LTE and 5G core networks for enterprises." Exhibit 20 at 3. In addition, APNS communicates with the Affirmed Service Automation Platform, another private IP network.

**1 APNSM Deployment Network Architecture**




(https://apnsdocs.blob.core.windows.net/plte/Private_Network_Service_Manager_User_Guide_v1.1.0.pdf), at 223.

133. The '988 Accused Products support a second interface to communicate through gateway communication networks, as shown below.




Exhibit 16 at 2.

> Affirmed Networks' vEPC provides high performance, scalable, cost-effective vEPC functions, including:
>
> - Mobility Management Entity/Serving GPRS Support Node (MME/SGSN)
> - Serving Gateway (SGW)
> - Gateway GPRS Support Node/Packet Data Network Gateway (GGSN/PGW)
> - Evolved Packet Data Gateway (ePDG)
> - Trusted Wireless Access Gateway (TWAG)
> - CIoT Serving Gateway Node (CSGN) – Narrow-Band IoT (NB-IoT)
> - Policy and Charging Rules Function (PCRF)
> - Authentication, Authorization, and Accounting (AAA)
> - Home Subscriber Server (HSS)

Exhibit 35 at 1 (showing interfaces to multiple communications gateway).

134. The '988 Accused Products provide a server for receiving communications from mobile communication devices through a wireless transceiver. As shown below, vEPC provides a complete set of 5G VNFs to deliver 4G/5G services via wireless transceiver. Exhibit 11 at 3.




*Figure 1. Affirmed Virtual Evolved Packet Core (vEPC) Components*

*Id*.

135. vEPC includes Single Radio Voice Call Continuity ("SRVCC") functionality to allow devices to move active communications from an LTE to a legacy circuit domain, as shown below.

**4.2.23 Single Radio Voice Call Continuity (SRVCC)**

Single Radio Voice Call Continuity (SRVCC) functionality is defined in TS 23.216v10.2.0 and TS 29.280v10.3.0. SRVCC functionality enables a SRVCC-capable UE to seamlessly move an active IMS voice call (in PS domain) from LTE coverage to legacy circuit domain. The following types of SRVCC HO are supported by this feature:

- E-UTRAN to GERAN without DTM support
- E-UTRAN to GERAN with DTM without DTM HO
- E-UTRAN to UTRAN without PS HO
- E-UTRAN to UTRAN with PS HO

Exhibit 27 at 68.

136. vEPC will "assign the dual capable UEs to the new non-standalone EPC slice and allow the legacy UEs to continue to go to the legacy EPC . . ." via the DMAG. 5G Service Velocity & Distributed Service Provider Cloud.mp4, at 34:37-36:57 (https://www.youtube.com/watch?v=vZ3KhILLpo0).




5G Service Velocity & Distributed Service Provider Cloud.mp4, at 34:37 (https://www.youtube.com/watch?v=vZ3KhILLpo0).

137. Defendants' infringement of the '988 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

138. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT VI**
**(Indirect Infringement of the '988 Patent)**

139. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

140. Defendants know about the '988 Patent and that the Accused Products infringe the '988 Patent, at least from their receipt of this Complaint, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

141. In addition to directly infringing the '988 Patent, as discussed above, Defendants have induced infringement of the '988 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least Claim 42 and by performing the methods of at least Claims 1 and 33.

142. Defendants knowingly and actively aided and abetted the direct infringement of the '988 Patent by instructing and encouraging their customers, developers, and partners to use and install the Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes,

webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the Accused Products.

143. For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '988 Accused Products in an infringing manner (as described above). Exhibit 30 (https://azure.microsoft.com/en-us/support/community/). Azure Community Support covers in-depth installing and configuring the '988 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '988 Accused Products' mobile edge computing and services features.

144. Defendants also published numerous white papers that explain and identify the Accused Products as working in the infringing manner and being configured in the infringing manner. *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/). Defendants provide product blog posts that cover the Accused Products' infringing features and instruct customers on how to configure and use the Accused Products in an infringing manner. Exhibit 32 (https://www.affirmednetworks.com/blog/).

145. In addition, Defendants support customers' use and configuration of the Accused Products through a dedicated support center. Exhibit 33 (https://www.affirmednetworks.com/support/).

146. Defendants are also liable for contributory infringement of the '988 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least Claim 42 by offering to sell and selling in the United States the Accused Products. The Accused Products are, at a minimum, a material component of the systems that infringe Claim 42 of the '988 Patent, and are not a staple article or

commodity of commerce suitable for substantial noninfringing use. In particular, at least as of their receipt of this Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the ‘988 Patent. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the ’988 Patent, including Claim 42.

147. Defendants know that their Accused Products are particularly suited to be used as part of a mobile network system, even if Defendants do not sell all components of the mobile network system.

148. Defendants' indirect infringement of the ’988 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.

149. Defendants' indirect infringement has caused and is continuing to cause damage and irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

150. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT VII**
**(Direct Infringement of the ’409 Patent)**

151. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

152. Defendants have infringed and continue to infringe the ’409 Patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States the Accused Products.

153. Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

154. Defendants' acts of making, using, importing, selling, and offering for sale the Accused Products have been without the permission, consent, authorization, or license of Lemko.

155. To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.

156. To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the Accused Products. Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the Accused Products as a combination and provide services to manage and configure the Accused Products as a combination. Moreover, Defendants jointly control and put into service the Accused Products.

157. Defendants further directly infringe by directing and controlling the infringing systems and performance of the infringing methods and obtain benefits from their control of the systems and performance of the methods as a whole, for example, when Defendants configure and maintain the infringing systems as a service for their customers.

158. Defendants' infringement includes, but is not limited to, the manufacture, use, sale, importation and offer for sale of the Core MEC Products and Affirmed vProbe (collectively, the "'409 Accused Products").

159. The '409 Accused Products provide a DMAG to support "a virtualized architecture" in MEC to provide mobile networking. Exhibit 24 at 2.

160. The vEPC can support a DMAG for "a variety of deployment models including in public, private, hybrid, and edge clouds in either consolidated or CUPS configurations." Exhibit 11 at 3.

161. Additionally, ASE includes a storage device that "acts as a cloud storage gateway" and enables data transfers to Azure. Exhibit 12 at 6.

162. vEPC supports the offline charging interface adapted to communicate with a legacy network, such as GPRS Tunneling Protocol Prime ("GTPP"), which is a legacy network interface adapted to communicate with a legacy communication network. Exhibit 25 at 252. This permits calls routed by the DMAG to be communicated via the legacy network interface.

163. vEPC provides "high performance, scalable, cost-effective vEPC functions," including HSS, MME, and AAA, to receive registration information from subscribers on DMA nodes. Exhibit 35 at 1. vEPC delivers "a full stack of 4G/5G gateway and mobility functions" that are 3GPP standard compliant to route calls by the first group of DMA nodes. Exhibit 11 at 3.

164. The HSS registers the second group of DMA nodes when they are roaming with respect to the DMAG. Based on "the peer's status and the subscriber's local home/visiting status," a subscriber is classified as "Home, Roam-in, or Roam-out." Exhibit 25 at 171. A peer can be classified as "local (same administrative domain) or remote (different administrative domain)" based on GTP classification. *Id.* at 172.

165. Through vEPC gateway service, the DMAG can route communications directed to the mobile stations served by the second DMA node. The SGW acts as "a mobility anchor point and routes data between the eNodeB base station and the [Packet Data Network (PDN)] gateway." Exhibit 35 at 5.

166. Affirmed vProbe is a master agent adapted to receive performance data from each DMA node of the first group of DMA nodes and each DMA node of the second group of DMA nodes. Affirmed vProbe is "co-located with the Affirmed's Mobile Content Cloud vEPC and WiFi Solutions rather than delivered as a separate network appliance" to record data for each dMA node. Exhibit 36 at 1.




Exhibit 17 at 3.

167. Affirmed vProbe provides an operations module to report "session control, subscriber events and subscriber data selectively through user defined-filtering" including vControl Flow (collection of all control plane traffic) and vData Flow (user defined filtering of data plane traffic). Exhibit 36 at 2.

168. Affirmed vProbe stores Intelligent Event Data Records ("iEDRs"), "[c]omplete granular data capture of session, bearer, flow, and transaction details in the data and control plane," in storage device. Exhibit 37 at 9. The iEDR hierarchy is shown below:

**Figure 5: Affirmed Intelligent Event Data Record Hierarchy for deep packet analysis**




*Id.* (showing the iEDRs stored in hierarchy for deep packet probe).

169. Virtual Monitoring through Affirmed vProbe is necessary to "address the dynamic management of mobility, policies, data bearers and the interoperability with legacy 3G/2G systems." Exhibit 37 at 13. The performance data is sent to an additional DMAG via a private IP network because the "EPC is a high-performance, high-capacity, all-IP core network." *Id.*

170. Finally, the vEPC's MME provides gateway selection within the EPC, performing "signaling and selection of legacy gateways for handovers to other 2G/3G networks," with the legacy networks routing a portion of the calls by DMAG. Exhibit 37 at 13.

171. Defendants' infringement of the '409 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

172. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT VIII**
**(Indirect Infringement of the '409 Patent)**

173. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

174. Defendants know about the '409 Patent and that the Accused Products infringe the '409 Patent, at least from their receipt of this Complaint, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

175. In addition to directly infringing the '409 Patent, as discussed above, Defendants have induced infringement of the '409 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least Claim 1.

176. Defendants knowingly and actively aided and abetted the direct infringement of the '409 Patent by instructing and encouraging their customers, developers, and partners to use and install the Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the Accused Products.

177. For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '409 Accused Products in an infringing manner (as described above). Exhibit 30 (https://azure.microsoft.com/en-us/support/community/). Azure Community Support covers in-depth installing and

configuring the ‘409 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the ‘409 Accused Products’ mobile edge computing and services features.

178. Defendants also published numerous white papers that explain and identify the Accused Products as working in the infringing manner and being configured in the infringing manner. *See*, *e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/). Defendants provide product blog posts that cover the Accused Products’ infringing features and instruct customers on how to configure and use the Accused Products in an infringing manner. Exhibit 32 (https://www.affirmednetworks.com/blog/).

179. In addition, Defendants support customers’ use and configuration of the Accused Products through a dedicated support center. Exhibit 33 (https://www.affirmednetworks.com/support/).

180. Defendants are also liable for contributory infringement of the ’409 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least Claim 1 by offering to sell and selling in the United States the Accused Products. The Accused Products are, at a minimum, a material component of the systems that infringe Claim 1 of the ‘409 Patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use. In particular, at least as of their receipt of this Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the ‘409 Patent. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the ’409 Patent, including Claim 1.

181. Defendants' indirect infringement of the '409 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

182. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT IX**
**(Direct Infringement of the '111 Patent)**

183. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

184. Defendants have infringed and continue to infringe the '111 Patent, including at least Claims 1 and 10, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States the Accused Products.

185. Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

186. Defendants' acts of making, using, importing, selling, and offering for sale the Accused Products have been without the permission, consent, authorization, or license of Lemko.

187. To the extent any components of the claimed apparatuses are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing apparatus.

188. To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the Accused Products. Affirmed

Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the Accused Products as a combination and provide services to manage and configure the Accused Products as a combination. Moreover, Defendants jointly control and put into service the Accused Products.

189. Defendants further directly infringe by directing and controlling the infringing apparatuses and performance of the infringing methods and obtain benefits from their control of the apparatuses and performance of the methods as a whole, for example, when Defendants configure and maintain the infringing apparatuses as a service for their customers.

190. Defendants' infringement includes, but is not limited to, the manufacture, use, sale, importation and offer for sale of the Core MEC Products and ACE (collectively, the "'111 Accused Products").

191. The '111 Accused Products support mobile networks, as shown below. Exhibit 38 at 3.




*Figure 1. Affirmed Virtual Evolved Packet Core (vEPC) Components*

Exhibit 11 at 3.

192. ASE includes an apparatus with "a portfolio of devices that bring compute, storage, and intelligence to the edge right where data is created." Exhibit 39 at 3.

193. ACE is a DMA to "support high bandwidth, low latency applications and Multi-Access Edge Computing." Exhibit 19 at 4.




Exhibit 19 at 4.

194. ASE is "a cloud-managed, hardware-as-a-service solution," with processors and software (instructions stored on a computer-readable storage device) to "bring[] the Azure cloud's power to a local and robust server that can be deployed virtually anywhere local AI and advanced computing tasks need to be performed." Exhibit 16 at 2.

195. vEPC performs the instructions in the computer-readable storage to "deliver[] the advanced network capabilities that mobile operators need to deploy a complete 5G non-standalone architecture (NSA) network: control and user plane separation (CUPS), network slicing, service automation, and fully virtualized, cloud-native network functions." Exhibit 11 at 1

196. vEPC provides "high performance, scalable, cost-effective vEPC functions," including HSS, MME, and AAA, to receive registration information from subscribers. Exhibit 35 at 1.

197. The DMA system receives registration information associated with a mobile device when the device attaches to the network. In the MME, the selection between the GPRS register interface and S6d interface between SGSN and HSS is based on the "[International Mobile Subscriber Identity] range of the UE and the hss-hlr-routing table that is configured on the SGSN [(Serving GPRS Support Node)]." Exhibit 27 at 80. For example, the IMSI could be routed to the HLR via a Gr Interface.

| 11 | IMSI routing to HLR via Gr interface. |
|---|---|

In this example for IMSI of prefix 228, they get routed to Gr interface (as opposed to S6).

```
user@host% set mme-sgsn imsi-routing hss-hlr-routing 228 interface-type gr routing-option
standard hss-realm nortel.com

user@host% show mme-sgsn imsi-routing hss-hlr-routing 228
interface-type gr;
routing-option standard;
hss-realm nortel.com;
```

*Id*. at 85.

198. Based on "the peer's status and the subscriber's local home/visiting status," a device is classified as "Home, Roam-in, or Roam-out." Exhibit 25 at 171. A peer can be classified as "local (same administrative domain) or remote (different administrative domain)" based on GTP classification. *Id*. at 172. The interface to the peer is classified as the following:

| GW Type | GTP Peer | Interface Classification |
|---|---|---|
| SGW | Local PGW | S5 |
| SGW | Remote PGW | S8 |
| PGW | Local SGW | S5 |
| PGW | Remote SGW | S8 |
| GGSN | Local SGSN | Gn |
| GGSN | Remote SNGS | Gp |

*Id*.

199. The '111 Accused Products receive location update requests through the SGW from a third DMA system for the mobile device in the second DMA system and handle the update through the MME and HSS functions. Particularly, vEPC's MME/SGSN is "a fully Virtualized Network Function (VNF)" and provides "mobility and session management operations in separated or combined modes for 2G, 3G, 3G+ and 4G mobile data subscribers." Exhibit 25 at 54. The SGW in the DMA system connects to an MME in the network through an S11 interface, as shown below.

**Table 7-3 SGW Interface Support**

| Interface | Node-Node | Protocol | Plane |
|---|---|---|---|
| S1-U | SGW- eNB | GTPv1-U | User Plane |
| S4 | SGW - SGSN | GTPv1-U | |
| | | GTPv2-C | Control Plane |
| S5<br>S8 | SGW - PGW | GTPv1-U | User Plane |
| | | GTPv2-C | Control Plane |
| S11 | SGW - MME | GTPv2-C | Control Plane |
| S12 | SGW - WCDMA RNC | GTPv1-U | User Plane |
| Gz | SGW - OFCS | Diameter | User Plane |
| Ga | SGW - CFG | GTP' | User Plane |
| X1_1 | X1_1 interface to LI administrator (ADMF) | Proprietary | User Plane |

*Id.*, at 151.

200. Through the HSS and MME, the '111 Accused Products send the location update request to devices in the second DMA system based on the requests from the third DMA system. When the UE attaches to the network, as part of an update location request (ULR), the Network Provided Location Information ("NPLI") capabilities of the MME/SGSN are provided to the HSS. Exhibit 27 at 71.

201. The '111 Accused Products receive a destination IP address (e.g., IPv6) associated with the mobile subscriber from the second DMA system through the vEPC after

the request for location information is retrieved. They also discover the NPLI through ULR from the second DMA system for the device from mobile subscriber location information provided to the HSS from the MME.

202. The Accused Products' MME will respond to the ULR and send back to the HSS of the third DMA system "the UE state, location information, UE Time Zone." Exhibit 27 at 72.

203. ACE uses "SGW and PGW to support network services for 4G, LTE, and 5G on a standards-based open architecture." Exhibit 19 at 4-5.




*Id*. The SGW and PGW form peer-to-peer IP connections over supported interfaces depending on the classification of the network. *Id.*

204. Using IP-based protocol over the interfaces between peer connections (SGW-PGW), the '111 Accused Products connect communications from the third DMA system to the second DMA system using the destination IP of the user mobile. When GTP peers are "configured and associated with a gateway instance, the gateway instance (by default) begins path management procedures for each peer." Exhibit 25 at 170. Therefore, the DMA system

can communicate with other DMA systems via peer-to-peer IP connections including IPv4 and IPv6 simultaneously assigned. *Id*. at 173.

205. Defendants' infringement of the '111 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

206. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT X**
**(Indirect Infringement of the '111 Patent)**

207. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

208. Defendants know about the '111 Patent and that the Accused Products infringe the '111 Patent, at least from their receipt of this Complaint, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

209. In addition to directly infringing the '111 Patent, as discussed above, Defendants have induced infringement of the '111 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as an apparatus infringing at least Claim 1 and software infringing at least Claim 10, and by performing the method of at least Claims 15.

210. Defendants knowingly and actively aided and abetted the direct infringement of the '111 Patent by instructing and encouraging their customers, developers, and partners to use

and install the Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the Accused Products.

211. For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '111 Accused Products in an infringing manner (as described above). Exhibit 30 (https://azure.microsoft.com/en-us/support/community/). Azure Community Support covers in-depth installing and configuring the '111 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '111 Accused Products' mobile edge computing and services features.

212. Defendants also published numerous white papers that explain and identify the Accused Products as working in the infringing manner and being configured in the infringing manner. *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/). Defendants provide product blog posts that cover the Accused Products' infringing features and instruct customers on how to configure and use the Accused Products in an infringing manner. Exhibit 32 (https://www.affirmednetworks.com/blog/).

213. In addition, Defendants support customers' use and configuration of the Accused Products through a dedicated support center. Exhibit 33 (https://www.affirmednetworks.com/support/).

214. Defendants are also liable for contributory infringement of the '111 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least Claims 1 and 10 by offering to sell and selling in the

United States the Accused Products. The Accused Products are, at a minimum, a material component of the apparatuses and computer readable storage devices that infringe Claims 1 and 10 of the '111 Patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use. In particular, at least as of their receipt of this Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the '111 Patent. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '111 Patent, including Claims 1 and 10.

215. Defendants' indirect infringement of the '111 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

216. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT XI
## (Direct Infringement of the '980 Patent)

217. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

218. Defendants have infringed and continue to infringe the '980 Patent, including at least Claims 1 and 15, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States the Accused Products.

219. Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

220. Defendants' acts of making, using, importing, selling, and offering for sale the Accused Products have been without the permission, consent, authorization, or license of Lemko.

221. To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.

222. To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the Accused Products. Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the Accused Products as a combination and provide services to manage and configure the Accused Products as a combination. Moreover, Defendants jointly control and put into service the Accused Products.

223. Defendants further directly infringe by directing and controlling performance of the infringing methods and obtain benefits from their control of the performance of the methods as a whole, for example, when Defendants configure and maintain the Accused Products as a service for their customers.

224. Defendants' infringement includes, but is not limited to, the manufacture, use, sale, importation and offer for sale of the Core MEC Products and APNS (collectively, the "'980 Accused Products"). The Core MEC Products and APNS provide private LTE/5G networks. Exhibit 20 at 3.




Exhibit 15 at 1.

225. In particular, vEPC provides hardware with processors and non-transitory computer readable storage mediums to process instructions to support functions covering network policy, security, and analytics, as illustrated below:




Exhibit 29 at 1.

226. vEPC provides HSS, SGW, and PGW functions to help "fixed and mobile service providers build the next-generation of networks using carrier-class, natively virtualized solutions." Exhibit 38 at 3. vEPC's components are shown below:




*Figure 1. Affirmed Virtual Evolved Packet Core (vEPC) Components*

Exhibit 11 at 3.

227. vEPC's location service "furnishes users with information about the physical location of a UE." Exhibit 27 at 73. The HSS based NPLI retrieval is provided over the Sh interface "between HSS and the Application Server (AS)" to determine if the UE is within the wireless coverage area of a first DMA server. Exhibit 27 at 71. When the UE attaches to the network, the NPLI capabilities of the MME/SGSN are provided to the HSS. *Id.*

228. The HSS will query "for user state, location information, UE time zone information in a subsequent Insert Subscriber Data Request (IDR) towards that MME/SGSN." *Id.* at 71-72. The MME/SGSN will send the response back to "HSS with the UE state, location information, UE Time Zone in Insert Subscriber Data response (IDA)." *Id.* at 72.

229. As shown below, mobile devices are "classified as home or visiting based on the subscriber's PLMNID (Public Land Mobile Network ID) and the gateway (GW) PLMID configuration." Exhibit 25 at 171. The GW compares the PLMNID of the subscriber (contained in the IMSI table) to the PLMNIDs in the home and roaming lists to decide the subscriber as either home or visiting. *Id.*

**Home, Visiting, and Roaming Subscribers**

Subscribers are classified as home or visiting based on the subscriber's PLMNID and the GW PLMID configuration. The GW compares the PLMNID of the subscriber (contained in the IMSI table) to the PLMNIDs in the home and roaming lists and declares the subscriber as follows:

*home* – The subscriber's PLMNID matches the PLMNID in the home list.

*visiting* – The subscriber's PLMNID matches the PLMNID in the roaming list.

The system uses a default classification in the gateway common profile to classify subscribers that do not match configured PLMNIDs.

Based on the peer's status and the subscriber's local home/visiting status, a subscriber is classified as *Home, Roam-in,* or *Roam-out*. Roaming subscribers are defined as subscribers that traverse a non-home device and are identified by the SGW, PGW, and GGSN as follows:

- SGW determines if the PGW is in the same PLMN (connected via an S5 interface) or a different PLMN (connected via an S8 interface).
- PGW determines if the SGW is in the same PLMN (connected via an S5 interface) or a different PLMN (connected via an S8 interface).
- GGSN determines if the SGSN is in the same PLMN (connected via a Gn interface) or a different PLMN (connected via a Gp interface).

*Id*.

230. Once the subscribers are classified as home or roaming, the registration information is identified by HSS and NPLI. The first DMA server will handle the calls based on the location information for all communication services such as video, audio, or text over the networks (e.g., IP Multimedia Subsystem network). The HSS will identify the physical location of the destination device, if it is outside of the coverage of the first DMA server.

231. vEPC's Roamer Control enables "network operators the ability to regulate access for subscribers of partner operators where the network is shared." Exhibit 27 at 126. Once the destination device is roamed to the visiting network, the SGW is located in the visiting network. The mobile device will be classified as roaming based on the second registration data in the visiting network.

232. The SGW and PGW are connected to a plurality of DMA servers through either S5 or S8 interfaces depending on the roaming status. GTP peers are classified as "local (same administrative domain) or remote (different administrative domain)" based on the following

criteria: if the GTP peer is configured, the GTP peer is classified as "local or remote based on the configuration." Exhibit 25 at 172. The interface to the peer is classified as S5/S8 or Gn/Gp, as shown below. *Id.*

**Classification Based on GTP Configuration**

If the GTP peer is configured, the GTP peer is classified as local or remote based on the configuration. The interface to the peer is classified as S5/S8 or Gn/Gp as follows:

| GW Type | GTP Peer | Interface Classification |
|---|---|---|
| SGW | Local PGW | S5 |
| SGW | Remote PGW | S8 |
| PGW | Local SGW | S5 |
| PGW | Remote SGW | S8 |
| GGSN | Local SGSN | Gn |
| GGSN | Remote SNGS | Gp |

*Id.*

233. If the GTP is dynamic, the GTP is classified based on "the serving network in the GTP message or default classification." Exhibit 25 at 172.

If the GTP is dynamic, the GTP is classified based on the serving network in the GTP message or default classification as follows:

| GW Type | Condition | Interface Classification |
|---|---|---|
| SGW | Default Classification | S5/S8 based on configuration |
| PGW | Serving network in Home PLMNID list | S5 |
| PGW | Serving network in Roaming PLMNID list | S8 |
| PGW | Serving network unknown | S5/S8 based on configuration |
| GGSN | Serving network in Home PLMNID list | Gn |
| GGSN | Serving network in Roaming PLMNID list | Gp |
| GGSN | Serving network unknown | Gn/Gp based on configuration |

*Id.*

234. The Accused Products convert the call to packet data and route to the UE with both SGW and PGW through the second DMA server in the visiting network. vEPC includes 3GPP core network functions such as SGW for "handoff between the RAN [(radio access network)] and core network" and PGW "for interconnect between the core and external IP networks." Exhibit 11 at 4.

235. Defendants' infringement of the '980 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

236. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT XII**
**(Indirect Infringement of the '980 Patent)**

237. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

238. Defendants know about the '980 Patent and that the Accused Products infringe the '980 Patent, at least from their receipt of this Complaint, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

239. In addition to directly infringing the '980 Patent, as discussed above, Defendants have induced infringement of the '980 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to install and use the Accused

Products as instructions stored on computer-readable storage medium, infringing at least Claim 15, and to perform the methods of at least Claims 1 and 10.

240. Defendants knowingly and actively aided and abetted the direct infringement of the ’988 Patent by instructing and encouraging their customers, developers, and partners to use and install the Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the Accused Products.

241. For example, Defendants operate an online site called “Azure Community Support,” with discussions and articles covering the use of the ’980 Accused Products in an infringing manner (as described above). Exhibit 30 (https://azure.microsoft.com/en-us/support/community/). Azure Community Support covers in-depth installing and configuring the ‘980 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the ‘980 Accused Products’ mobile edge computing and services features.

242. Defendants also published numerous white papers that explain and identify the Accused Products as working in the infringing manner and being configured in the infringing manner. *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/). Defendants provide product blog posts that cover the Accused Products’ infringing features and instruct customers on how to configure and use the Accused Products in an infringing manner. Exhibit 32 (https://www.affirmednetworks.com/blog/).

243. In addition, Defendants support customers' use and configuration of the Accused Products through a dedicated support center. Exhibit 33 (https://www.affirmednetworks.com/support/).

244. Defendants are also liable for contributory infringement of the '980 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least Claim 15 by offering to sell and selling in the United States the Accused Products. The Accused Products are, at a minimum, a material component of the computer-readable storage media that infringe Claim 15 of the '980 Patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use. In particular, at least as of their receipt of this Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the '980 Patent. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '980 Patent, including Claim 15.

245. Defendants' indirect infringement of the '980 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' indirect infringement has caused and is continuing to cause damage and irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

246. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT XIII**
**(Direct Infringement of the '478 Patent)**

247. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

248. Defendants have infringed and continue to infringe the '478 Patent, including at least Claims 9 and 16, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States the Accused Products.

249. Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

250. Defendants' acts of making, using, importing, selling, and offering for sale the Accused Products have been without the permission, consent, authorization, or license of Lemko.

251. To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing apparatus.

252. To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the Accused Products. Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the Accused Products as a combination and provide services to manage and configure the Accused Products as a combination. Moreover, Defendants jointly control and put into service the Accused Products.

253. Defendants further directly infringe by directing and controlling the infringing apparatuses and performance of the infringing methods and obtain benefits from their control of the apparatuses and performance of the methods as a whole, for example, when Defendants configure and maintain the infringing systems as a service for their customers.

254. Defendants' infringement includes, but is not limited to, the manufacture, use, sale, importation and offer for sale of the Core MEC Products and Azure Network Function Manager, APNS, and Affirmed Network Slicing (collectively, the "'478 Accused Products").

255. ASE supports "a virtualized architecture" in MEC. Exhibit 24 at 2.

256. Azure Network Function Manager, part of Defendants' MEC platform, provides "an Azure Marketplace experience for deploying network functions such as mobile packet core, SD-WAN edge, and VPN services to [the] Azure Stack Edge device running in [] on-premises environment." Exhibit 40 at 1.

257. APNS provides an apparatus that "combined its industry-leading mobile core technology with Microsoft's cloud capabilities to create a complete turnkey solution for private LTE/5G networks." Exhibit 20 at 3. It "employs [a distributed] Control and User Plane Separation technology and supports three types of deployment modes to address a variety of operator desired scenarios for offering to enterprises." Exhibit 16 at 2.

258. vEPC provides a complete set of 5G VNFs, such as MME and DMAGs, including SGW and PGW, as shown below.




*Figure 1. Affirmed Virtual Evolved Packet Core (vEPC) Components*

Exhibit 11 at 3.

259. Affirmed vSSF is available to operators "to simplify operations and streamline gateway (re-) selection across multiple dedicated virtual core network instances (and legacy gateways where needed)" by utilizing "a control-plane application internal to the operator core network." Exhibit 41 at 6. It enables the '478 Accused Products to serve different use cases and service functions through selections of multiple vEPC DMAG instances.




*Figure 1. Affirmed Virtual Slice Selection Function (vSSF)*

Exhibit 23 at 1.

260. Through vSSF, a first interface (e.g., Sv interface) will interact with legacy networks. Sv interface supports "the Single Radio Voice Call Continuity procedure between the MME and the VLR such that a voice call started on the EPC network using VoLTE can be handed over to the legacy circuit domain." Exhibit 27 at 59. "Sv interface IP address of the VLR" (visitor location register) can be configured "to set the type of VLR discovery (either local or DNS)." *Id.*

### 4.2.13 Sv to VLR

The Sv interface supports the Single Radio Voice Call Continuity procedure between the MME and the VLR such that a voice call started on the EPC network using VoLTE can be handed over to the legacy circuit domain seamlessly.

Follow these steps to configure the Sv interface IP address of the VLR and to set the type of VLR discovery (either local or DNS).

| Step # | Action |
|---|---|
| 1 | Configure the VLR discovery type (local or DNS).<br>**Note:** If the attribute value is 'dns' then the MME uses DNS query to look up the MSC server.<br>**Note:** If the attribute value is 'local-config' then the MME uses the locally configured Sv interface ip-address and bypasses the DNS query. |

```
user@host% set mme-sgsn interface sv sv-if vlr-discovery local-config
OR
user@host% set mme-sgsn interface sv sv-if vlr-discovery dns
```

| Step # | Action |
|---|---|
| 2 | Configure the vlr-type and sv-ip-address of VLR for Sv interface.<br>**Note:** Attribute vlr-type can be: Gs, SGs, Sv or combination of interfaces. For a VLR that supports more than one type, input one set command for each type, but use the same VLR name each time. |

```
user@host% set mme-sgsn service-area vlr <vlr-name> vlr-type sv
user@host% set mme-sgsn service-area vlr <vlr-name> sv-ip-interface <ipv4-address or ipv6-address>
```

*Id.* vEPC can communicate with a private IP network, such as the IP Multimedia Core Network Subsystem ("IMS") network via SGW/PGW through a second interface (e.g., Gy/Gx). The PGW/SGW supports the features required to operate an IMS-based VoLTE service. Exhibit 25 at 152.

261. Because of vSSF, the first DMAG can communicate and select the second DMAG transparently to the users. The vEPC's MME can connect to SGSN, part of the DMAG communication network, through "S3, S4, and S6d interfaces," the third interface. Exhibit 27 at 78. The SGSN has the option of "interworking with EPC network elements, including MME, SGW, and HSS respectively." Exhibit 27 at 78.

262. vEPC communicates with the DMA servers of the first group using MME/SGW via vSSF running on a DMAG communication network.

263. The information transmitted to the second DMAG via the vSSF provides the subscriber information in HSS, accessible to the first DMAG. When the UE attaches to the

network, "as part of update location request (ULR) the NPLI [Network Provided Location Information] capabilities of the MME/SGSN is provided to the HSS." Exhibit 27 at 71.

264. The HSS also stores subscriber types such as homer, "subscribers who are homed on [the] network," and roamer, "subscriber who are roaming on [the] network." Exhibit 27 at 131. When the destination device such as UE joins the legacy network, the subscriber information is identifiable and retrievable through HSS. The same information is later shared with the second DMAG by the DMA servers connected to the first DMAG.

Subscriber types are as follows:

| Subscriber Type | Explanation |
|---|---|
| homer | Only Subscribers who are homed on this network |
| roamer | Only Subscribers who are roaming on this network |
| All | All Subscribers types |

*Id.*

265. The first instance and second instance of the vEPCs deployed through vSSF will use a different group of servers. Through access point name ("APN") and vEPC, the Accused Products' network slicing functionality can serve "different user groups in 4G" and migrate to "end-to-end network slicing in 5G." Exhibit 41 at 2.

**Figure 4: Virtual Slice Selection Function**




*Source: Affirmed Networks*

*Id.* at 6.

266. The HSS connecting to the first DMAG stores the device information and shares the information with the second DMAG by identifying the server information in the first DMAG. The MME/SGSN provides optional configuration to "allow classification of subscribers as roamers based on IMSI mask, which is typically fixed per roaming partner." Exhibit 27 at 124.

267. As shown below, devices are "classified as home or visiting based on the subscriber's PLMNID and the GW PLMID configuration." Exhibit 25 at 171. The gateway compares the PLMNID of the device (contained in the IMSI table) to the PLMNIDs in the home and roaming lists to decide if the device is either home or visiting. *Id.*

**Home, Visiting, and Roaming Subscribers**

Subscribers are classified as home or visiting based on the subscriber's PLMNID and the GW PLMID configuration. The GW compares the PLMNID of the subscriber (contained in the IMSI table) to the PLMNIDs in the home and roaming lists and declares the subscriber as follows:

*home* – The subscriber's PLMNID matches the PLMNID in the home list.

*visiting* – The subscriber's PLMNID matches the PLMNID in the roaming list.

The system uses a default classification in the gateway common profile to classify subscribers that do not match configured PLMNIDs.

Based on the peer's status and the subscriber's local home/visiting status, a subscriber is classified as *Home*, *Roam-in*, or *Roam-out*. Roaming subscribers are defined as subscribers that traverse a non-home device and are identified by the SGW, PGW, and GGSN as follows:

- SGW determines if the PGW is in the same PLMN (connected via an S5 interface) or a different PLMN (connected via an S8 interface).
- PGW determines if the SGW is in the same PLMN (connected via an S5 interface) or a different PLMN (connected via an S8 interface).
- GGSN determines if the SGSN is in the same PLMN (connected via a Gn interface) or a different PLMN (connected via a Gp interface).

Exhibit 25 at 171.

268. The '478 Accused Products route the packets in the communication supported by the communication network (e.g., legacy network) or the IP network through SGW and PGW (the point of connection to the external communication network). vEPC includes 3GPP core network functions such as SGW for "handoff between the RAN [(radio access network)]

and core network" and PGW "for interconnect between the core and external IP networks." Exhibit 11 at 4.

269. Defendants' infringement of the '478 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

270. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT XIV**
**(Indirect Infringement of the '478 Patent)**

271. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

272. Defendants know about the '478 Patent and that the Accused Products infringe the '478 Patent, at least from their receipt of this Complaint, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

273. In addition to directly infringing the '478 Patent, as discussed above, Defendants have induced infringement of the '478 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as an apparatus infringing at least Claim 16, as software infringing at least Claim 9, and by performing the method of at least Claim 1.

274. Defendants knowingly and actively aided and abetted the direct infringement of the '478 Patent by instructing and encouraging their customers, developers, and partners to use

and install the Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the Accused Products.

275. For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '478 Accused Products in an infringing manner (as described above). Exhibit 30 (https://azure.microsoft.com/en-us/support/community/). Azure Community Support covers in-depth installing and configuring the '478 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '478 Accused Products' mobile edge computing and services features.

276. Defendants also published numerous white papers that explain and identify the Accused Products as working in the infringing manner and being configured in the infringing manner. *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/). Defendants provide product blog posts that cover the Accused Products' infringing features and instruct customers on how to configure and use the Accused Products in an infringing manner. Exhibit 32 (https://www.affirmednetworks.com/blog/).

277. In addition, Defendants support customers' use and configuration of the Accused Products through a dedicated support center. Exhibit 33 (https://www.affirmednetworks.com/support/).

278. Defendants are also liable for contributory infringement of the '478 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least Claim 16 by offering to sell and selling in the United

States the Accused Products. The Accused Products are, at a minimum, a material component of the apparatuses that infringe Claim 16 and the computer-readable storage media that infringe Claim 9 of the '478 Patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use. In particular, at least as of their receipt of this Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the '478 Patent. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '478 Patent, including Claim 16.

279. Defendants' indirect infringement of the '478 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

280. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT XV
## (Direct Infringement of the '931 Patent)

281. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

282. Defendants have infringed and continue to infringe the '931 Patent, including at least Claims 7 and 12, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States the Accused Products.

283. Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

284. Defendants' acts of making, using, importing, selling, and offering for sale the Accused Products have been without the permission, consent, authorization, or license of Lemko.

285. To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system or machine-readable storage device.

286. To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the Accused Products. Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the Accused Products as a combination and provide services to manage and configure the Accused Products as a combination. Moreover, Defendants jointly control and put into service the Accused Products.

287. Defendants further directly infringe by directing and controlling the infringing systems and performance of the infringing methods and obtain benefits from their control of the systems and performance of the methods as a whole, for example, when Defendants configure and maintain the infringing systems as a service for their customers.

288. Defendants' infringement includes, but is not limited to, the manufacture, use, sale, importation and offer for sale of the Core MEC Products and APNS (collectively, the "'931 Accused Products").

289. As shown below, the '931 Accused Products provide a system to help "fixed and mobile service providers build the next-generation of networks using carrier-class, natively virtualized solutions." Exhibit 38 at 3.




Figure 1. Affirmed Virtual Evolved Packet Core (vEPC) Components

Exhibit 11 at 3.

290. APNS "combined its industry-leading mobile core technology with Microsoft's cloud capabilities to create a complete turnkey solution for private LTE/5G networks." Exhibit 20 at 3. As shown below, APNS is a DMAG management system with a service manager because Affirmed Networks' advanced CUPS technology provides "maximum deployment flexibility to match a wide variety of customer use cases." *Id.* at 3.




Figure 1. Affirmed Private Network Service

*Id.*

291. ASE supports "a virtualized architecture" in MEC to "deliver telco-grade mobile core performance at the edge in a lightweight design." Exhibit 24 at 2.

292. APNS provides Azure Monitor, an operation determination module, to "maximize the availability and performance of [the] applications and services." Exhibit 42 at 1. The data collected by Azure Monitor are available "right in [the] Overview page in the Azure portal." *Id.* at 3. As shown below, the monitoring data are available in Azure Portal to "build, manage, and monitor everything from simple web apps to complex cloud deployments." Exhibit 43 at 1.




Exhibit 15 at 1.

293. Azure Monitor receives messages "from [the] application, any operating system and services it relies on, down to the platform itself." Exhibit 42 at 4.

294. Micro service observability tools, such as Istio, are used to provide service assurance in a cloud-native network and show "where errors are happening." Exhibit 44 at 3.




Exhibit 45 at 1.

295. As shown below, Istio can monitor MME, SGW, and PGW, micro-services based functions.




Exhibit 46 at 11.

296. Envoy in Istio resolves the members of the clusters in DMAG through service discovery. The service discovery service (SDS) is "a generic REST based API used by Envoy to fetch cluster members." Exhibit 47 at 2. Active health checking and the SDS service discovery type "go hand in hand" to detect a failure condition. Exhibit 48 at 1.

297. As shown below, Istio's Control Plane is the DMAG selection module that uses traffic routing rules to "control the flow of traffic and API calls between services." Exhibit 49 at 1-2.




Istio Architecture

Exhibit 50 at 1. The control plane of Istio "manages and configures the [Envoy] proxies to route traffic." *Id.*

298. Furthermore, Envoy enforces "circuit breaking limits at the network level" and "supports various types of fully distributed (not coordinated) circuit breaking." Exhibit 51 at 1. Circuit breaker with outlier detection and ejection is "the process of dynamically determining whether some number of hosts in an upstream cluster are performing unlike the others and removing them from the healthy load balancing set." Exhibit 52 at 1.

299. Istio also uses "a round-robin load balancing policy, where each service instance in the instance pool gets a request in turn" by default. Exhibit 49 at 8. Istio supports

other models such as "random," "weighted," or "least requests" for load balancing when failure occurs in a DMA system. *Id.*

300. Istio's Data Plane is a notification module. It is "composed of a set of intelligent proxies (Envoy) deployed as sidecars." Exhibit 50 at 1. The sidecar deployment allows Istio to "enforce policy decisions and extract rich telemetry which can be sent to monitoring systems to provide information about the behavior of the entire mesh." *Id.* at 2. Istio notifies the second DMAG (SGW) of fault conditions, such as failover, in order to take over the operation of the first SGW.

301. Envoy's cluster discovery service API layers on "a mechanism by which Envoy can discover upstream cluster used during routing" to locate the SGW on ASE through bootstrap messages (second notifications). Exhibit 53 at 1-2.

302. Envoy's cluster manager handles all of the complexity of "knowing which hosts are available and healthy." Exhibit 54 at 1. Clusters known to the cluster manager can be configured "either statically, or fetched dynamically via the cluster discovery service (CDS) API." *Id.* The cluster discovery service (CDS) will enable Envoy to "dynamically fetch cluster manager members." Exhibit 55 at 1.

303. Istio directs the external system's calls to the mobile stations through the second SGW by gateway configuration, a third notification. Istio uses gateway to "manage inbound and outbound traffic" from the service mesh containing vEPC. Exhibit 49 at 9-10. Gateway configurations are applied to standalone Envoy proxies that are running at the edge of the mesh. *Id.* Through the gateway, ingress traffic from the external system will be routed to the destination where the mesh service (the second SGW) is located.

304. Defendants' infringement of the '931 Patent has injured and continue to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

305. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT XVI**
**(Indirect Infringement of the '931 Patent)**

306. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

307. Defendants know about the '931 Patent and that the Accused Products infringe the '931 Patent, at least from their receipt of this Complaint, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

308. In addition to directly infringing the '931 Patent, as discussed above, Defendants have induced infringement of the '931 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least Claim 7 and by performing the method of at least Claim 1.

309. Defendants knowingly and actively aided and abetted the direct infringement of the '931 Patent by instructing and encouraging their customers, developers, and partners to use and install the Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes,

webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the Accused Products.

310. For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '931 Accused Products in an infringing manner (as described above). Exhibit 30 (https://azure.microsoft.com/en-us/support/community/). Azure Community Support covers in-depth installing and configuring the '931 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '931 Accused Products' mobile edge computing and services features.

311. Defendants also published numerous white papers that explain and identify the Accused Products as working in the infringing manner and being configured in the infringing manner. *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/). Defendants provide product blog posts that cover the Accused Products' infringing features and instruct customers on how to configure and use the Accused Products in an infringing manner. Exhibit 32 (https://www.affirmednetworks.com/blog/).

312. In addition, Defendants support customers' use and configuration of the Accused Products through a dedicated support center. Exhibit 33 (https://www.affirmednetworks.com/support/).

313. Defendants are also liable for contributory infringement of the '931 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least Claim 7 by offering to sell and selling in the United States the Accused Products. The Accused Products are, at a minimum, a material component of the systems that infringe Claim 7 of the '931 Patent, and are not a staple article or

commodity of commerce suitable for substantial noninfringing use. In particular, at least as of their receipt of this Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the ‘931 Patent. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the ’931 Patent, including Claim 7.

314. Defendants’ indirect infringement of the ’931 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.

315. Defendants’ indirect infringement has caused and is continuing to cause damage and irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

316. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney’s fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Lemko prays for judgment and relief as follows:

A. An entry of judgment holding that Defendants have infringed and are infringing the ’763, ‘414, ‘988, ‘409, ‘111, ’980, ‘478, and ‘931 Patents; and have induced infringement and are inducing infringement of the ’763, ‘414, ‘988, ‘409, ‘111, ’980, ‘478, and ‘931 Patents; and/or have contributorily infringed and continues to contribute to infringement of the ’763, ‘414, ‘988, ‘409, ‘111, ’980, ‘478, and ‘931 Patents;

B. A preliminary and permanent injunction against Defendants and their officers, employees, agents, servants, attorneys, instrumentalities, and/or those in privity with them, from infringing, or inducing the infringement of the ’763, ‘414, ‘988, ‘409, ‘111, ’980, ‘478, and ‘931 Patents and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

C. An award to Lemko of such damages as it shall prove at trial against Defendants that is adequate to fully compensate Lemko for Defendants' infringement of the '763, '414, '988, '409, '111, '980, '478, and '931 Patents, said damages to be no less than a reasonable royalty;

D. An award to Lemko of enhanced damages under 35 U.S.C. § 284;

E. A finding that this case is "exceptional" and an award to Lemko of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

F. An accounting of all infringing sales and revenues, together with post judgment interest and prejudgment interest from the first date of infringement of the '763, '414, '988, '409, '111, '980, '478, and '931 Patents; and

G. Such further and other relief as the Court may deem proper and just.

Respectfully submitted,

Dated: February 14, 2022

*s/ Jon Hyland*
Jon B. Hyland (Bar Number: 24046131)
HILGERS GRABEN
10000 N. Central Expy., Ste 400
Dallas, TX 75231-4180
Telephone: 972-645-3097
jhyland@hilgersgraben.com

*Attorneys for Plaintiff,*
Lemko Corporation

**DEMAND FOR JURY TRIAL**

Lemko demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: February 14, 2022

*s/ Jon Hyland*
Jon B. Hyland (Bar Number: 24046131)
HILGERS GRABEN
10000 N. Central Expy., Ste 400
Dallas, TX 75231-4180
Telephone: 972-645-3097
jhyland@hilgersgraben.com

*Attorneys for Plaintiff*,
Lemko Corporation