**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| LEMKO CORPORATION, an Illinois Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| MICROSOFT CORPORATION, a Washington Corporation, and AFFIRMED NETWORKS, INC., a Delaware Corporation, | ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 3:22-CV-363-L-BT

**DEMAND FOR JURY TRIAL**

### AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Lemko Corporation ("Lemko") files this Amended Complaint for Patent Infringement and Demand for Jury Trial against Microsoft Corporation and Affirmed Networks, Inc. (collectively "Defendants") and alleges as follows:

### THE PARTIES

1.      Lemko is an Illinois corporation, with its principal place of business at 846 East Algonquin Road, Suite #101, Schaumburg, IL 60173.

2.      Founded in 2004, Lemko provides a leading, fully edge-capable mobile network platform and resilient 4G/5G wireless networks for use in Industrial Internet of Things ("IoT") applications, private 4G/5G networks, wireless rural broadband systems, and military and public safety deployments.

3.      Microsoft Corporation ("Microsoft") is a Washington corporation. Microsoft may be served through its agent for service of process, CSC Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

1

4.      Affirmed Networks, Inc. ("Affirmed Networks") is a Delaware corporation.
Affirmed Networks may be served through its agent for service of process, CSC Lawyers
Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

5.      Microsoft acquired Affirmed Networks in 2020, and Affirmed Networks is now
a wholly-owned subsidiary of Microsoft.  Microsoft and Affirmed Networks variously
developed the Accused Products (defined below).

## JURISDICTION AND VENUE

6.      This action for patent infringement arises under the patent laws of the United
States, 35 U.S.C. § 101 *et seq.*  This Court has original jurisdiction over this controversy
pursuant to 28 U.S.C. §§ 1331 and 1338.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and
1400(b).

8.      The Court has personal jurisdiction over Microsoft because Microsoft has
continuous and systematic contacts with this District.  Microsoft Corporation maintains an
office in this District at 7000 and 7100 State Highway 161, Building LC1 & LC2, Irving,
Texas 75039.  On information and belief, this office is a regular and established place of
business.

9.      The Court has personal jurisdiction over Affirmed Networks because Affirmed
Networks has continuous and systematic contacts with this District.  Affirmed Networks
maintains an office in this District at 2280 Campbell Creek Boulevard, Suite # 325,
Richardson, TX 75082.  On information and belief, this office is a regular and established
place of business.  For example, at the time of the filing of the original complaint, Affirmed
Networks was actively hiring employees for multiple positions based in Dallas.  Exhibit 1
(https://careers.microsoft.com/us/en/search-results?keywords=%23Affirmednetworks).

10.    Additionally, the Court has personal jurisdiction over Defendants in this action because Defendants have committed acts of direct and indirect infringement in this District, including through selling and offering for sale infringing products and services in this District, because Lemko's claims arise out of and relate to Defendants' acts of infringement in this District, and because the exercise of jurisdiction by the Court over Defendants in this action would be reasonable and would not offend traditional notions of fair play and substantial justice given Defendants' persistent presence and contact with this District.

**LEMKO'S INNOVATIONS AND ASSERTED PATENTS**

11.    Based in Schaumburg, Illinois, Lemko has developed commercial networks using CDMA, 2G, 3G, 4G, and 5G technologies.

12.    In 2004, Lemko began offering innovative network products and services that provided multi-access edge computing ("MEC") and were decentralized and virtualized. Lemko's products were based on very different paradigms from then-conventional network technology offerings.

13.    Conventional cellular networks were based on circuit-switched, circuit transmission networks with a centralized, hierarchical architecture.  All calls were carried from cell towers to regional call centers over expensive backhaul connections.  The regional call centers relied on stacks of custom hardware to manage and route calls for an entire region.  The cell towers had no functionality for managing and routing calls, since that capacity was located in the regional call centers. This approach had many disadvantages, including the need for expensive backhaul to and from regional call centers, even when the two parties to a phone call were in the same area, because the cell towers could not manage or connect calls without the regional call centers.

3

14.     Conventional networks were also hardware-based.  The mobile switching centers ("MSCs") were housed at large Digital Signal Processor ("DSP") equipment server centers, where the MSCs relied on stacks of DSP equipment servers and provided the call processing functionality for the networks, including switching functions, call set-up, call termination, and routing.

15.     Lemko's products and services use a novel, distributed mobile architecture ("DMA") structure.  Lemko's decentralized DMA architecture offered significant benefits over then-conventional cellular networks.  In contrast to the centralized conventional networks, Lemko's DMA networks are based on software-based DMA servers, which are connected to form peer-to-peer DMA networks.  Each DMA server has local cellular network management functionality that allows for calls to be connected without the centralized servers of a regional call center.

16.     Lemko's decentralized networks allowed for all network function virtualization ("NFV") or virtualized network function ("VFN") or Network Functions Virtualization Infrastructure ("NFVI") for MEC, which refers to locating computing of traffic and services closer to the customer (the "edge" of a network) as opposed to locating that computing functionality in centralized server farms.

17.     Lemko's networks were also virtualized, which refers to providing through software network resources that were traditionally delivered in hardware.  Specifically, Lemko's DMA implements network functionalities, such as Mobile Switching Center ("MSC"), Base Station Controller ("BSC"), community location register ("CLR"), and home location register ("HLR") functionality, on software running on a decentralized, standard server (an edge server).

18.    Lemko's innovative approach allowed the link between cellular radio (Base Transceiver Station ("BTS") in 2G, NodeB in 3G, E-UTRAN Node B ("eNodeB") in 4G and Next Generation Node B ("gNb") in 5G) and MEC server (DMA server) to be changed from conventional circuit-based transmission to full IP-based transmission.  In addition, Lemko's technology enable connecting multiple cellular nodes via IP connections, thereby reducing or eliminating backhaul via T1/E1 circuit-based communication lines and eliminating or reducing the need for a centralized center or hub.

19.    Lemko developed multiple product lines based on its inventions.  Lemko's MEC products and services allow local mobile devices to communicate through an edge server without connecting through a regional call center, improving performance and reducing costs.

20.    The United States Patent and Trademark Office ("USPTO") awarded to Lemko patents covering solutions for providing MEC networks and other improvements in communications technology and the underlying infrastructure.

21.    On June 16, 2009, the USPTO issued U.S. Patent No. 7,548,763 (the "'763 Patent"), entitled "System, Method, and Device for Providing Communications Using a Distributed Mobile Architecture."  The '763 Patent identifies Dr. Shaowei Pan as its inventor and states that it was assigned to Lemko.  Attached hereto as Exhibit 2 is a true and correct copy of the '763 Patent.

22.    The '763 Patent generally discloses providing for group communications between participants, where each participant communicates with a base transceiver station controller coupled to a DMA server.  The DMA servers may be configured to permit duplex communications capabilities between participants.

23.     On January 26, 2010, the USPTO issued U.S. Patent No. 7,653,414 (the "'414 Patent"), entitled "System, Method, and Device for Providing Communications Using a Distributed Mobile Architecture."  The '414 Patent identifies Dr. Pan as its inventor and states that it was assigned to Lemko.  Attached hereto as Exhibit 3 is a true and correct copy of the '414 Patent.

24.     The '414 Patent generally discloses a DMA system that includes an authentication, authorization, and accounting ("AAA") module with a destination preference register, which includes a preferred path for communications to be routed outside of a DMA network accessible to the DMA system.

25.     On December 21, 2010, the USPTO issued U.S. Patent No. 7,855,988 (the "'988 Patent"), entitled "System, Method, and Device for Routing Calls Using a Distributed Mobile Architecture."  The '988 Patent identifies Dr. Pan as its inventor and states that it was assigned to Lemko.  Attached hereto as Exhibit 4 is a true and correct copy of the '988 Patent.

26.     The '988 Patent generally discloses network communications systems for routing communications between distributed mobile architecture servers using DMA gateways ("DMAGs") where communications information indicates one or more devices accessible by one of a group of DMA servers and a legacy communications network.  Communication information is received at a first DMAG for a communications network accessible by a second DMAG.

27.     On January 31, 2012, the USPTO issued U.S. Patent No. 8,107,409 (the "'409 Patent"), entitled "OAMP for Distributed Mobile Architecture."  The '409 Patent identifies Dr. Pan as its inventor and states that it was assigned to Lemko.  Attached hereto as Exhibit 5 is a true and correct copy of the '409 Patent.

28.     The '409 Patent generally discloses a DMAG that routes communications to DMA nodes and to roaming DMA nodes, including communications received from a legacy network, and to DMA nodes that can send performance data to a home DMAG and to a visitor DMAG.

29.     On April 1, 2014, the USPTO issued U.S. Patent No. 8,688,111 (the "'111 Patent"), entitled "System, Method, and Device for Providing Communications Using a Distributed Mobile Architecture."  The '111 Patent identifies Dr. Pan as its inventor and states that it was assigned to Lemko.  Attached hereto as Exhibit 6 is a true and correct copy of the '111 Patent.

30.     The '111 Patent generally discloses receiving at a first DMA system, communications from a first mobile device directed to a second mobile device, and determining whether the second mobile device is registered with one of the first DMA system and a second DMA system based on information stored at an AAA module.

31.     On November 17, 2015, the USPTO issued U.S. Patent No. 9,191,980 (the "'980 Patent"), entitled "System and Method to Control Wireless Communications."  The '980 Patent identifies Dr. Pan as its inventor and states that it was assigned to Lemko.  Attached hereto as Exhibit 7 is a true and correct copy of the '980 Patent.

32.     The '980 Patent generally discloses controlling wireless communications when communications are associated with a destination device and received from a first mobile device at a base transceiver station ("BTS") interface of a first DMA server to determine if a first DMAG supports communications with the destination device based on registration data stored at the first DMA server.

33.     On May 3, 2016, the USPTO issued U.S. Patent No. 9,332,478 (the "'478 Patent"), entitled "System, Method, and Device for Routing Calls Using a Distributed Mobile Architecture."  The '478 Patent identifies Dr. Pan as its inventor and states that it was assigned to Lemko.  Attached hereto as Exhibit 8 is a true and correct copy of the '478 Patent.

34.     The '478 Patent generally discloses transmitting communications information from a first DMAG to a second DMAG in a DMAG communication network, where the information is associated with a communication network accessible by the first DMAG, and receiving a communication from the second DMAG via the DMAG communication network.

35.     On September 5, 2017, the USPTO issued U.S. Patent No. 9,755,931 (the "'931 Patent"), entitled "Fault Tolerant Distributed Mobile Architecture."  The '931 Patent identifies Dr. Pan as its inventor and states that it was assigned to Lemko.  Attached hereto as Exhibit 9 is a true and correct copy of the '931 Patent.

36.     The '931 Patent generally discloses detecting a failure condition relating to a first DMAG at a DMAG management system in communication with at least the first DMAG, a second DMAG, and DMA nodes, and determining if a first DMAG is offline based on a failure condition, selecting the second DMAG, sending a first notification from the DMAG management system to the second DMAG, and sending a second notification from the DMAG management system to an external system configured to connect calls to a mobile station via the first DMAG.

37.     The '763, '414, '988, '409, '111, '980, '478, and '931 Patents are collectively referred to herein as the "Asserted Patents."

38.     The Asserted Patents are not abstract and specifically claim inventive concepts that represent significant improvements over conventional networking technology.

Specifically, each of the Asserted Patents describes various hardware architectures with a variety of connection techniques that can be used with mobile device technology, particularly in edge-networks.

39.    For example, each of the Asserted Patents solves problems relating to different aspects of determining if a mobile device is registered with a specific DMA or is roaming and should be connected to a different home DMA, interconnecting DMA networks with legacy communication networks so that mobile devices can seamlessly communicate with both local DMAs and non-local legacy networks, locally routing data to devices where possible instead of using backhaul to a non-local network, interconnecting DMA gateways to appropriately route communications to destination devices, and detecting and responding to network failure conditions.

40.    The technology disclosed in the Asserted Patents was not available in the art at the time of the inventions because conventional networking systems did not provide such functionality, and did not provide the specific solutions using the specific components set forth in the claims of the Asserted Patents.  To the contrary, then-conventional technology was based on a different paradigm where much of the network resources and processing was centrally located in large, air-conditioned server farms, and controlled with large racks of hardware relying on DSP and custom hardware cards, rather than with smaller, distributed network elements that work together at the "edge" of the network.

41.    The Asserted Patents disclose more than just a simple combination of generic components to perform conventional activities.  The Asserted Patents improve networking systems, especially for use in edge networks, and solve specific problems with edge networks variously using new components in an unconventional manner.  For example, the claims of the

Asserted Patents variously recite DMA servers, DMA gateways, and networking flows that were not conventional at the time of the inventions.

42.    For example, certain claims of the Asserted Patents variously recite: a DMA gateway with an interface to communicate with a legacy communication network, a home DMA register with a list of DMA nodes and designated routes for communication with mobile devices, a visitor DMA register with a list of DMA nodes that are roaming with respect to the DMA gateway and the DMA gateway being able to route calls to mobile devices served by the roaming DMA nodes, a master agent that receives performance data from the DMA nodes, and an operations module that stores the performance data, and sends the performance data to DMA gateways.  Other claims of the Asserted Patents ascribe other specific and non-conventional functions and networking requirements on DMA servers and DMA gateways.

43.    In addition, the claims are rooted in computer technology as they are directed to specific hardware architectures with different applications that improve the communications of and between mobile devices and the infrastructure supporting such devices.  Thus, the claims of the Asserted Patents recite specific steps and components to accomplish the desired results and go beyond simply claiming a result.  Accordingly, the inventions of the Asserted Patents allow for a new kind of infrastructure and communications network that was not previously possible.

44.    Lemko has marked and continues to mark its patent-practicing products with stickers identifying the applicable patents and identified and continues to identify the applicable patents in the documentation for its software products.

45.    On information and belief, Defendants know of the Asserted Patents and that Defendants' Accused Products (defined below) infringe the Asserted Patents from their awareness of Lemko's patent-marked products, which compete with the Accused Products.

46.    On information and belief, Defendants are also aware of the Asserted Patents through Martin Taylor, who is in Microsoft's Office of the CTO, Azure for Operators, and in Microsoft's Program Management, Azure for Operators.  In the 2010 to 2012 timeframe, Mr. Taylor was the CTO of Metaswitch Networks.  During that time, Mr. Taylor and others at Metaswitch discussed a potential partnership with Lemko, evaluated Lemko's technology, and participated in meetings with Lemko, and Lemko informed them that Lemko had obtained patents and was pursuing additional patents covering its inventions.  Mr. Taylor remained with Metaswitch Networks until Microsoft acquired it in July 2020.  On information and belief, Mr. Taylor is directly involved in the Accused Products discussed below.

47.    Defendants further know of the Asserted Patents and that Defendants' Accused Products infringe the Asserted Patents from their receipt of Lemko's original Complaint on or about February 16, 2022.  Lemko's original Complaint identifies the Asserted Patents, alleges that Defendants infringe the Asserted Patents, and explains the reasons Defendants infringe Lemko's Asserted Patents.

48.    Defendants further know of the Asserted Patents and that Defendants' Accused Products infringe the Asserted Patents from their receipt of Lemko's Preliminary Infringement Contentions on December 20, 2022.  Lemko's Preliminary Infringement Contentions provide detailed claim charts explaining how Defendants' Accused Products infringe each of the Asserted Patents.

49.    On information and belief, Defendants have not taken any action to avoid infringing Lemko's Asserted Patents since receiving Lemko's original Complaint or Preliminary Infringement Contentions.

## DEFENDANTS' INFRINGING PRODUCTS

50.    **Overview of the Accused Products:** Defendants make, use, sell, offer for sale, and/or import into the United States and this District products and services that infringe the Asserted Patents (the "Accused Products").

51.    The Accused Products are used to provide MEC networks that are implemented on a decentralized network, VFN or NFV, and are used to operate private telecommunications networks for data transmission and voice calls that can interoperate with outside networks, such as the Internet and common-carrier cellular networks.

52.    As discussed in more detail below, the Accused Products include core network functionality, servers, and add on services.  Core network functionality manages the connections between users and the network and provides network access.  Servers are used to host the software that provides the mobile network packet core functionality.  Add-on services include a variety of additional functionalities for managing, monitoring, and controlling the networks.

53.    Defendants sell the Accused Products to customers to operate on their own servers (or on servers sold with the software of the Accused Products), sell the Accused Products as software to operate on cloud-hosted servers (i.e., on servers not located on the customers' premises), and sell the Accused Products as a "service" where Defendants configure and operate the Accused Products for their customers.  Exhibit 10 at 11 (private mobile network-as-a-service).

54.    Over time, Defendants have introduced different versions of the Accused Products to correspond to the then-available network technologies and standards.  For example, Affirmed Networks has offered products to provide 4G (LTE) core network functionality and, more recently, 5G core network functionality.  These products allow customers to operate private networks that replicate the functionality of 4G (LTE), 5G, or combination 4G (LTE) and 5G networks while also connecting to the Internet and public-carrier cellular networks.

55.    The Accused Products include at least the following products and services:

- Affirmed Mobile Core;

- Affirmed Networks' Mobile Content Cloud ("MCC");

- Affirmed Cloud Edge ("ACE");

- Affirmed UnityCloud;

- Affirmed Private Network Service ("APNS");

- Azure Stack Edge ("ASE") servers; and

- Affirmed Networks' vProbe.

56.    **Affirmed Mobile Core:** Prior to Microsoft's acquisition of Affirmed Networks, Affirmed Networks first marketed its mobile packet core as "vEPC" (virtual Evolved Packet Core) and Affirmed Mobile Packet Core.  After Microsoft's acquisition of Affirmed Networks, Defendants began to market the mobile packet core as "Affirmed Mobile Core," or simply "mobile core" or "mobile packet core."  These terms are synonymous and refer to both Affirmed Networks' 4G (LTE) and/or 5G packet core solutions (together, the "Mobile Packet Core").  Affirmed Networks' Mobile Packet Core also supports backwards compatibility with earlier networks, such as 2G and 3G compatible devices.

57.     Affirmed Networks sometimes uses the term "Evolved Packet Core (EPC)" to refer to just its 4G (LTE) packet core running on an edge server.  At other times, Affirmed Networks uses "vEPC" to refer to both its 4G (LTE) packet core and 5G core capabilities. Affirmed Networks also refers to its 5G core offering as "5GC," rather than "EPC" or "vEPC." Exhibit 12 (describing the "Affirmed 5GC Network Architecture").  Affirmed Networks continues to market vEPC as a stand-alone solution.  Exhibit 13 (describing vEPC solution).

58.     Defendants have stated that their "vEPC solution delivers the advanced network capabilities that mobile operators need to deploy a complete 5G non-standalone architecture (NSA) network: control and user-plane separation ("CUPS"), network slicing, service automation, and fully virtualized, cloud-native network functions."  Exhibit 11 at 1. Defendants' "vEPC platform delivers a full stack of 4G/5G gateway and mobility functions." Exhibit 11 at 3.

59.     For example, in Exhibit 10 at 15, Microsoft describes that "[t]he final component of Microsoft's architectural approach to private mobile networks is the 4G/5G mobile core, which can be deployed as a non-standalone (NSA) 5G core, standalone (SA) 5G core, or 4G virtualized Evolved Packet Core (vEPC) as a single platform . . . . The 5G core can be deployed on VMs, physical servers, or on an operator's cloud as a mobile-core-as-a-service, eliminating the need for dedicated hardware."  *Id.*

60.     Affirmed Networks' 4G Mobile Packet Core product includes virtualized implementations of at least the following 4G network nodes and services: MME (Mobility Management Entity), SGW (Serving Gateway), PGW (Packet Data Network (PDN) Gateway), HSS (Home Subscriber Server), PCRF (Policy and Charging Rules Function), AAA (Authentication, Authorization and Access), SGSN and GGSN (3G packet core components

analogous to the SGW and PGW for 4G), ePDG and TWAG (WiFi gateways for non-trusted and trusted access), CSGN and SCEF (for NB IoT – Internet of Things, factory sensors, etc.). Exhibit 14.  These virtualized functions are provided by software instead of dedicated DSP hardware.

61.     Affirmed Networks' 5G Mobile Packet Core product includes virtualized implementations of at least the following 5G network nodes and services: AMF (Access and Mobility Function, analogous to the 4G MME), SMF (Session Management Function), UPF (User Plane Function, (analogous to the 4G SGW and PGW packet handling), NRF (Network Repository Function for managing the network), NSSF (Network Slice Selection Function for network slicing), NEF (Network Exposure Function for exposing capability information to external entities), and N3IWF (Non-3GPP Interworking Function).  These virtualized functions are provided by software instead of dedicated DSP hardware.

62.     As discussed above, the Affirmed Mobile Core provides 4G, 5G, and 4G/5G network functionality.  In the examples provide throughout the remainder of this Complaint, examples of Affirmed Mobile Core's infringement are provided based on the 4G functionality. Affirmed Mobile Core's corresponding 5G functionality infringes in the same way.  For example, the functionality of the 5G AMF corresponds to the 4G MME discussed in the examples below.

63.     **Affirmed Networks' Add-On Services:** Affirmed Networks has provided and continues to provide add-on services that support and enhance its Mobile Packet Core.

64.     Prior to Microsoft's acquisition of Affirmed Networks, it offered the MCC and then the ACE and Affirmed UnityCloud.  Defendants now together offer the APNS.

65.     **Affirmed Networks' Mobile Content Cloud** is a software solution which includes the Affirmed Mobile Core as its centerpiece along with additional items.  These additional products include:

- Affirmed Service Automation Platform ("ASAP") for configuration of the platform;

- Intelligent vProbe and Analytics for monitoring of the core and extracting analytics;

- Affirmed Virtual Slice Selection Function ("vSSF"), which provides the virtual Slice Selection Function for 5G networks;

- Deep Packet Inspection ("DPI"), which adds the capability to look inside the data being carried over the network and perform additional processing; and

- Value-Added Services, such as media, content services such as web/video optimization, and content filtering and security services.  Exhibit 14 at 1.

66.     **Affirmed Cloud Edge** is a hybrid solution that provides for Control- and User-Plane Separation (CUPS) on top of the Affirmed Mobile Core.  The "control plane" is the management functionality that sets up links, authorizes users, and provides other management functionality.  The "user plane" is the actual handling of the packet data being exchanged between users.  ACE maintains the control plane functions at a centralized core site (or in the cloud) while the user plane functions—the actual data processing where latency really matters—are pushed to the edge.  ACE provides a mix of 4G and 5G network support.  These capabilities are shown in the following excerpt, and include HSS, MME, and PCRF functionalities:



Exhibit 19 at 4.

67.     Prior to its acquisition by Microsoft, Affirmed Networks stated that, "The Affirmed Cloud Edge (ACE) solution for mobile edge computing (MEC) offers Communications Service Providers (CSPs) and Enterprises the ability to host applications and keep data local on the customers' premise to minimize latency and maximize efficiency. Affirmed Networks' MEC solution can be deployed and utilized at the edge of the mobile operator's network or used as part of the Cloud Edge offering from AWS, Microsoft Azure or Google Cloud." *Id.* at 1.

68.     **Affirmed UnityCloud** is the solution built on Affirmed Networks' 5G core architecture, which is a "cloud native" design based off of microservices, containers, and orchestration.  Exhibit 18 at 1.  On information and belief, Affirmed UnityCloud is an evolution of Affirmed Networks' Mobile Content Cloud offering.  It includes a standard-based PaaS (Platform as a Service) layer that leverages the "best-of-breed open-source technologies"

including container lifecycle management, metrics, and logs. *Id*. at 2. Affirmed UnityCloud includes the Affirmed Mobile Core functionality.

69.     **Microsoft's Affirmed Private Network Service.** After acquiring Affirmed Networks, Microsoft began building and selling a bundled, turnkey solution for private networks and enterprises called "Affirmed Private Network Service" or APNS. APNS combines the following components into a single, bundled package:

- Affirmed Mobile Core – 4G/5G mobile core (i.e., vEPC);

- Affirmed Service Manager for deploying, monitoring and managing the network;

- Azure Stack Edge – cloud-managed edge computing (server hardware together with software to manage that hardware); and

- Azure Network Function Manager ("NFM") – a fully managed, cloud-native orchestration service to deploy and provision network functions on the Azure Stack Edge Pro server.



Exhibit 10 at 12 (showing that Microsoft's Private Networks Solution consists of a combination of ASE and Affirmed Service Manager (including 5G and 4G/5G mobile network combinations)); *see also* Exhibit 28 at 3-4 and Exhibit 20 at 3 ("The APNS [Affirmed Private Network Service] solution consists of Affirmed Mobile Core, Affirmed Service Manager, Microsoft Azure Stack Edge platform, and Azure Network Function Manager.").

70.    According to Defendants, "Affirmed Private Network Service (APNS) empowers MNOs [Mobile Network Operators] and MSPs [Managed Service Providers] to seize this opportunity with technology that combines Affirmed's industry-leading mobile core with Microsoft Azure's capabilities to create a complete turnkey solution for private LTE/5G networks for enterprises."  Exhibit 28 at 2.  In the figure below, the ASE server can be deployed as local (private) MEC or Cloud MEC, or both.  The Affirmed Mobile Core is

operated on an ASE server. The radio (gNB/eNodeB) and ASE servers are connected by an

IP-based link, as covered by Lemko's Asserted Patents. In conventional-cellular mobile

networks, the link between the radio and network is circuit-based connections (using T1/E1

connections). In the following figures, IP-based S1-MME and S1u interfaces are used to

connect the radio and MEC network with IP connections.



Exhibit 20 at 3.

71.    Microsoft has promoted that it is combining Affirmed Networks software with

Microsoft's Azure cloud and ASE servers. Exhibit 10 at 3 ("Microsoft has introduced an

innovative approach combining first and third-party capabilities for a fully integrated private

mobile network service for mobile operators and managed service providers. It combines

Azure cloud, Azure Stack Edge, Affirmed (now a Microsoft company) LTE /5G mobile core,

and end-to-end orchestration and management."); *id.* at 11 ("Affirmed Networks, now part of

Microsoft, provides the cloud-native mobile core on the single architecture").

20

**Integration with Azure Services**
Microsoft's approach opens up a rich ecosystem of applications to operators and enterprise customers, including business intelligence/analytics, artificial intelligence, and machine-learning applications from Microsoft and many others. Affirmed Networks, now part of Microsoft, provides the cloud-native mobile core on the single architecture, allowing enterprises to quickly move data in and out of their mobile network for processing in the cloud while intelligently choosing which data should be processed on-site and which should be sent to the cloud.



Figure 1

**Private mobile network-as-a-service**
Affirmed Networks, now part of Microsoft, continues to develop revolutionary core technology that allows operators, for the first time, to deploy a complete CBRS/4G/5G mobile core in the cloud as a service. The private mobile network-as-a-service approach completely changes the way private mobile networks are deployed and managed. Instead of being tied to location-based hardware, operators now have greater flexibility and can provide the mobile core functionality as a hosted and fully-managed service within the Azure for Operators cloud, whether on-premises or in the cloud.

Exhibit 10 at 11 (showing Defendants' offering of APNS hosted on Defendants' servers).

72.    Microsoft advertises the components of its bundled product as a combination of both Microsoft and Affirmed Networks offerings. *Id.* ("Affirmed Networks, now part of Microsoft, continues to develop revolutionary core technology that allows operators, for the first time, to deploy a complete CBRS/4G/5G mobile core in the cloud as a service.").

73.     Defendants offer multiple options for deploying the core network in APNS, including: (1) on dedicated hardware at the edge (i.e., running on ASE hardware); (2) all running in the cloud (Azure Cloud) with no functionality running on hardware at the edge; and (3) a hybrid where the control plane is run in the cloud (Azure Cloud) and the user-plane is run at the edge (ASE).  Exhibit 10 at 17 ("The Affirmed mobile core ensures that the solution can be deployed in several different ways: as a standalone edge in an isolated environment, in distributed mode by centralizing the control plane on Azure cloud and distributing the user plane on Azure Stack Edge, and fully-hosted on Azure cloud.").

74.     **Azure Stack Edge.**  The Affirmed Mobile Core is the software functionality that performs the core network (4G/5G) functions.  In the APNS, that software functionality is either run on Azure Stack Edge server or in the Azure Cloud.  The Azure Stack Edge is the server hardware that runs the Affirmed Mobile Core.  Exhibit 10 at 12 ("Azure Stack Edge provides a single point for processing mobile network data at the edge.").  In addition, Azure Stack Edge includes a software component that enables the server to be managed from the cloud.  ASE include Azure Stack Edge Pro and Azure Stack Edge Pro 2 options.

75.     **Azure Stack Edge Pro** is a "cloud managed edge compute appliance from Microsoft."  Exhibit 21 at 1.  Azure Stack Edge Pro is a "1U rack mount server," that is managed from the cloud.  *Id.* at 2.

76.     **Azure Stack Edge Pro 2** is a "new generation of AI-enabled edge computing device."  Exhibit 22 (Part 1) at 13.  It is a rack-mounted server, just as the Azure Stack Edge Pro is, but upgraded with "multiple models that closely align with your compute, storage, and memory needs" (*id.*) with "flexible form factors [and] multiple mounting options" (*id.*).

77.     Azure Stack Edge can operate Affirmed Service Manager.  As shown below, there is a "full stack" mode where the Affirmed Mobile Core MME, HSS, SGW, and PGW are all operated on ASE.  There is also a mode where only the user plane functions (SGW-UP and PGW-UP) are operated on an ASE on the customer's premises, while the control-plane functions of the MME, HSS, SGW, and PGW are cloud hosted.



Exhibit 15 at 1.

78.     The following is an example of Defendants' marketing of ASE in combination with Affirmed Network Functions Mobile Core and Azure Network Function Manager.



Exhibit 16 at 2.

<u>**COUNT I**</u>
**(Direct Infringement of the '763 Patent)**

79.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

80.    Defendants have infringed and continue to infringe the '763 Patent, including at least exemplary Claim 1, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States infringing products including each of the following (the "'763 Accused Products"):

- Affirmed Mobile Core (infringes alone);

- Affirmed Networks' Mobile Content Cloud (MCC) (infringes alone);

- Affirmed Cloud Edge (ACE) (infringes alone);

- Affirmed UnityCloud (infringes alone); and

- Affirmed Private Network Service (APNS) (infringes alone).

81.    Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

24

82.     Defendants' acts of making, using, importing, selling, and offering for sale the '763 Accused Products have been without the permission, consent, authorization, or license of Lemko.

83.     To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.  Defendants act as the final assembler by configuring the final infringing system at the direction of their customers.  Defendants further act as the final assembler by selling products such as Affirmed Private Network Service as a "bundled, turnkey solution," which combines several products, as discussed above.  Exhibit 28 at 2-3.

84.     To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the '763 Accused Products.  Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the '763 Accused Products as a combination and provide services to manage and configure the '763 Accused Products as a combination.  Moreover, Defendants jointly control and put into service the '763 Accused Products.  For example, Defendants' market and sell Affirmed Private Network Service, which combines Affirmed Mobile Core with Azure Stack Edge.

85.     Defendants further directly infringe by directing and controlling the infringing systems, and obtain benefits from their control of the systems as a whole, for example, when Defendants configure and maintain the infringing systems as a paid service for their customers.

86.     Defendants' customers directly infringe by using and making (to the extent Defendants are the final assembler of the infringing system) the '763 Accused Products as an

operating network.  As set forth with respect to Count II, Defendants induce and contribute to their customers' direct infringement.

87.    Claim 1 of the '763 Patent recites a system comprising a first distributed mobile architecture server, a second distributed mobile architecture server, and a program to allow a group call.  Claim 1 requires a base station controller module, but does not include a base station as an element.  The '763 Accused Products are computer-readable medium software that operate as a first and second DMA server, providing MSC functionality, base-station controller functionality, and call detail record ("CDR") generation functionality.  In addition, the '763 Accused Products include software to allow group calls.

88.    Each of the '763 Accused Products includes mobile mobility and switching functionality through MME, SGW, and PGW features operating at multiple nodes (include a first and second node).  These features include call routing and switching, mobility handover, and mobility management and charging functionality.  In the 5G versions of the '763 Accused Products, the MME functionality is provided by the AMF and the SGW and PGW functionality is provided by the UPF.

89.    Each of the '763 Accused Products include base-station controller functionality through MME, SGW, and PGW features operating at multiple nodes (include a first and second node).  These features include resource management, handover management, and traffic management functionality.

90.    Each of the '763 Accused Products includes CDR generation functionality operating at multiple nodes (include a first and second node).  The PGW in each of the '763 Accused Products connects to the PCRF, that is the Policy and Charging Rules Function, which enables service flow-based charging.  The PGW also connects to the Offline Charging

System ("OFCS") and Online Charging System ("OCS"), which support charging of end-users. The PGW generates CDRs.

91.      Each of the '763 Accused Products enables group calls among four or more mobile communication devices.  For example, the '763 Accused Products provide EPC (Evolved Packet Core) functionality, which supports VoLTE (Voice over Long Term Evolution), including the ability to allow group calling between multiple communication devices.  The '763 Accused Products' VoLTE functionality also supports emergency call handling on SGW and PGW for group emergency communications among multiple mobile devices identified by their International Mobile Equipment Identity ("IMEI"), establishing a dedicated bearer for the emergency communications or emergency communications session according to the QCI (Quality of Service Class Identifier) assigned by the network.  Exhibit 25 at 155 (Chapter 7, p. 10).  In addition, the '763 Accused Products also provide non-3rd Generation Partnership Project ("3GPP") compliant functionality, which includes group communications among four or more mobile communication devices.

92.      The '763 Accused Products allow, for example, the following telephony traffic flow.  The telephony traffic received at the first wireless transceiver (from a first mobile device) is passed to the first DMA server (through the SGW and PGW of that first DMA server). The hair-pinning feature of the '763 Accused Products allows that traffic to be routed back into the system rather than having to be routed out through the external network.  The traffic is routed through the PGW to the SGW of the second DMA server and then from there to the second wireless transceiver (and finally to the second mobile device).  The connections between the SGW and PGW (i.e., the S5/S8 interface) and between the PGWs are IP peer-to-

peer connections and so the telephony traffic received at the first wireless transceiver of the

first DMA server is transmitted to the second DMA server via a "peer-to-peer connection".



Schematic diagram showing modules of each of the '763 Accused Products, including the First

and Second DMA server and call flow.

93.    Claim 1 of the '763 Patent recites that the first and second DMA servers are in

direct physical connection with a wireless transceiver.  The wireless transceivers are not recited

as elements of the system itself, but rather limit the distributed mobile architecture servers by

requiring that they are designed to operate with a direct physical connection to a wireless

transceiver.  The '763 Accused Products are designed to operate with a direct S1 interface

connection to the eNodeB module which is a wireless transceiver.

94.    To the extent the wireless transceiver is deemed an element of the system of

claim 1, the infringing system is directly infringed when the '763 Accused Products are

operated in connection with the wireless transceiver element of the eNodeB module, which is

required for connections to mobile devices.  An eNodeB is "a logical network component

which serves one or more E-UTRAN cells . . . .The Evolved UTRAN (E-UTRAN) consists of eNodeBs, providing the E-UTRA user plane (PDCP/RLC/MAC/PHY) and control plane (RRC) protocol terminations towards the UE . . . .The eNodeBs are connected by means of the S1 interface to the EPC (Evolved Packet Core), more specifically to the MME (Mobility Management Entity) by means of the S1-MME and to the Serving Gateway (SGW) by means of the S1-U interface." Exhibit 23 at 33. This happens when Defendants use the '763 Accused Products, for example, for product testing and development, and by Defendants' customers when they use the '763 Accused Products. Defendants assist their customers to setup and configure the '763 Accused Products and, therefore, operate as the final assembler for the infringing systems. Defendants further function as the final assembler of the infringing network when they provide the '763 Accused Products as a service, and configure and operate the infringing systems as a paid service for their customers, including connecting the DMA servers to the eNodeBs.

95.    Defendants' infringement of the '763 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

96.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT II
### (Indirect Infringement of the '763 Patent)

97.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

98.    As set forth with respect to Count I, Defendants' customers directly infringe the '763 Patent when they use or assemble the '763 Accused Products as an operating network. In addition to directly infringing the '763 Patent, as discussed above, Defendants have induced and contributed to their customers' direct infringement of the '763 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least exemplary Claim 1.

99.    Defendants know about the '763 Patent and that the '763 Accused Products infringe the '763 Patent, at least from their receipt of Lemko's February 14, 2022 Complaint and December 20, 2022 Preliminary Infringement Contentions, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

100.    Defendants knowingly and actively aided and abetted the direct infringement of the '763 Patent. As discussed above, the '763 Accused Products infringe the '763 Patent through their provision of MSC functionality, base-station controller functionality, CDR generation functionality, and group call functionality. Defendants instruct and encourage their customers on how to use each of these core features of the '763 Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the '763 Accused Products.

101.    For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '763 Accused Products in an infringing manner (as described above). Exhibit 30 (https://azure.microsoft.com/en-

us/support/community/).  Azure Community Support covers in-depth installing and

configuring the '763 Accused Products, and includes tutorials, articles, support tickets, Q&A,

and exchanges of ideas regarding the '763 Accused Products' mobile edge computing and

services features.

102.    Defendants also published numerous white papers that explain and identify the

'763 Accused Products as working in the infringing manner and being configured in the

infringing manner described above.  *See, e.g.*, Exhibit 31

(https://www.affirmednetworks.com/asset-type/white-papers/).  Defendants provide product

blog posts that cover the '763 Accused Products' infringing features and instruct customers on

how to configure and use the '763 Accused Products in an infringing manner.  *See, e.g.,*

Exhibit 32 (https://www.affirmednetworks.com/blog/).

103.    In addition, Defendants support customers' use and configuration of the '763

Accused Products through a dedicated support center.  Exhibit 33

(https://www.affirmednetworks.com/support/).

104.    Defendants are also liable for contributory infringement of the '763 Patent

pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are

contributing to infringement of at least exemplary Claim 1 by offering to sell and selling in the

United States the '763 Accused Products.  To the extent Claim 1 of the '763 Patent requires a

wireless transceiver or a base station as an element of the system to be connected to the first

and second DMA server, the first and second DMA server, which Defendants provide, is, at a

minimum, a material component of the systems that infringe Claim 1 of the '763 Patent.  The

software of the '763 Accused Products, which provides the first and second DMA servers, is

not a staple article or commodity of commerce suitable for substantial noninfringing use.  The

function of the '763 Accused Products is to provide the accused networks, which infringe when they operate, and they have no purpose without connection to wireless transceivers.  In particular, at least as of their receipt of Lemko's original Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the '763 Patent, as discussed above.  Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '763 Patent, including Claim 1.

105.    Defendants' indirect infringement of the '763 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

106.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT III
### (Direct Infringement of the '414 Patent)

107.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

108.    Defendants have infringed and continue to infringe the '414 Patent, including at least exemplary Claims 9 and 17, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States infringing products including each of the following (the "'414 Accused Products"):

- Affirmed Mobile Core (infringes alone).

- Affirmed Networks' Mobile Content Cloud (MCC) (infringes alone);

- Affirmed Cloud Edge (ACE) (infringes alone);

- Affirmed UnityCloud (infringes alone); and

- Affirmed Private Network Service (APNS) (infringes alone).

109.    Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

110.    Defendants' acts of making, using, importing, selling, and offering for sale the '414 Accused Products have been without the permission, consent, authorization, or license of Lemko.

111.    To the extent any components of the claimed systems, for example of the system of Claim 17, are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.  Defendants act as the final assembler by configuring the final infringing system at the direction of their customers.  Defendants further act as the final assembler by selling products such as Affirmed Private Network Service as a "bundled, turnkey solution," which combines several products, as discussed above.  Exhibit 28 at 2-3.

112.    To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the '414 Accused Products.  Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the '414 Accused Products as a combination and provide services to manage and configure the '414 Accused Products as a combination.  Moreover, Defendants jointly control and put into service the '414 Accused Products.  For example, Defendants' market and sell Affirmed Private Network Service, which combines Affirmed Mobile Core with Azure Stack Edge.

33

113.    Defendants further directly infringe by directing and controlling the infringing systems, and obtain benefits from their control of the systems as a whole, for example, when Defendants configure and maintain the infringing systems as a paid service for their customers.

114.    Defendants' customers directly infringe by using and making (to the extent Defendants are the final assembler of the infringing system) the '414 Accused Products as an operating network.  Claim 9 is a method claim and is directly infringed by Defendants when they use the '414 Accused Products, for example for product testing and development, and by Defendants' customers when they use the '414 Accused Products.  As set forth with respect to Count IV, Defendants induce and contribute to their customers' direct infringement.

115.    One way in which the '414 Accused Products infringe upon claim 9 of the '414 patent is illustrated in the following figure with a first mobile device in a first wireless coverage area that initiates a call to a second mobile device, which can be in one of four different locations: (a) in the first wireless coverage area, (b) in the second wireless coverage area, (c) in the third wireless coverage area, or (d) in neither the first, second or third wireless coverage area.



116.    There are three instances of DMA systems each comprised of a Mobile Packet Core.  Each DMA system is connected to an eNodeB over the S1 interface (and S1-MME interface) (as a 4G LTE system), with a corresponding wireless coverage area.  The Mobile Packet Core includes 4G and/or 5G components, including the HSS which is distributed across the DMA systems.  Exhibit 28 at 4 ("APNS delivers seamless mobility across multiple enterprise sites through its distributed subscriber core and provides full mobility between private and public networks").

117.    Based on the information stored in the distributed HSS (which constitutes the HLR, VLR and CLR of the first DMA system), the first DMA system determines if the second mobile subscriber is located in the first wireless coverage area and, if so, the call is connected to the second mobile subscriber via the first DMA system. When the mobile moves to the second or third wireless coverage area, Tracking Area Updates (TAUs) are performed with the location information corresponding to this mobile updated in the distributed HSS (and

corresponding CLR). Based on the information in the CLR at the first DMA system the call is connected to the mobile subscriber in the corresponding wireless coverage area. If the mobile subscriber is not in any of the first, second or third wireless coverage areas the call is routed to the external network (via the PGW for 4G or UPF for 5G) with the choice of PDN (Packet Data Network) based on the APN (Access Point Name), which is the "destination preference register (DPR)" within the first DMA system.

118.    In an alternative configuration, the '414 Accused Products provide a distributed mobile architecture (DMA) network, with multiple DMA systems, each comprising MME, SGW, and PGW modules, which are provided by the software of the '414 Accused Products. Each such SGW has a wireless coverage area. The MME is connected to an HLR/VLR, which is generally referred to as the HSS in 4G/5G.

119.    When a first mobile subscriber attempts to call a second mobile subscriber, the '414 Accused Products support three scenarios: (a) the second mobile subscriber is in the first wireless coverage area, (b) the second mobile subscriber is in the second wireless coverage area, or (c) the second mobile subscriber is not in either the first or second wireless coverage area.

120.    When the software of the first EPC module receives a call from the first mobile subscriber, it determines where the second mobile subscriber is located so that the call can be routed appropriately. If the second mobile subscriber is within the first wireless coverage area, the call will be routed as per a normal VoLTE call.

121.    If the second mobile subscriber is within the second wireless coverage area, then the Affirmed Networks' "hair-pinning" feature allows the DMA system to determine that the mobile subscriber is within the second wireless coverage area and route the call to the

second mobile device in that second wireless coverage area without using any external network. The SGW/PGW has a "UE Pool" table which is used for the 'hair-pinning' feature. This table is the "community location register (CLR)." The UE pool indicates which devices (UEs) are located within the wireless coverage area associated with that SGW/PGW. If the destination device (UE) is identified as being in the UE pool and, therefore, within the wireless coverage area of the SGW/PGW, the hair-pinning feature routes the data to that destination UE without the packets going through the external network.

122.    If the destination device is not within the first or second wireless coverage area and is not identified in the UE pool information (i.e., not in the CLR), then the call data are routed through the PGW, which is connected to the external IP network. In choosing which PGW to use, the SGW uses the APN (Access Point Name), which is the "destination preference register (DPR)." Based on this APN, the appropriate external network (i.e., the appropriate Packet Data Network, or PDN, outside of the DMA network) is used for routing of the packets that constitute the call.

123.    For example, the following figure shows the components in the EPC, including the MME, SGW, and PGW, as well as the connection to the RAN (Radio Access Network, i.e., eNodeB), the IMS network, and the HSS:



*Figure 1. Affirmed Virtual Evolved Packet Core (vEPC) Components*

Exhibit 11 at 3.

124.     Defendants' infringement of the '414 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.  Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

125.     Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT IV
### (Indirect Infringement of the '414 Patent)

126.     Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

127.     As set forth with respect to Count III, Defendants' customers directly infringe the '414 Patent when they use or assemble the '414 Accused Products as an operating network. In addition to directly infringing the '414 Patent, as discussed above, Defendants have induced and contributed to their customers' direct infringement of the '414 Patent under 35 U.S.C. §

38

271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least exemplary Claims 9 and 17.

128.    Defendants know about the '414 Patent and that the '414 Accused Products infringe the '414 Patent, at least from their receipt of Lemko's February 14, 2022 Complaint and December 20, 2022 Preliminary Infringement Contentions, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

129.    Defendants knowingly and actively aided and abetted the direct infringement of the '414 Patent.  As discussed above, the '414 Accused Products infringe the '414 Patent through their provision of MME, SGW, and PGW modules and the functionality to route calls from a first mobile device to a second mobile device under different scenarios.  Defendants instruct and encourage their customers on how to use each of these core features of the '414 Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the '414 Accused Products.

130.    For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '414 Accused Products in an infringing manner (as described above).  Exhibit 30 (https://azure.microsoft.com/en-us/support/community/).  Azure Community Support covers in-depth installing and configuring the '414 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '414 Accused Products' mobile edge computing and services features.

131.    Defendants also published numerous white papers that explain and identify the '414 Accused Products as working in the infringing manner and being configured in the infringing manner described above.  *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/).  Defendants provide product blog posts that cover the '414 Accused Products' infringing features and instruct customers on how to configure and use the '414 Accused Products in an infringing manner.  *See, e.g.,* Exhibit 32 (https://www.affirmednetworks.com/blog/).

132.    In addition, Defendants support customers' use and configuration of the '414 Accused Products through a dedicated support center.  Exhibit 33 (https://www.affirmednetworks.com/support/).

133.    Defendants are also liable for contributory infringement of the '414 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least exemplary Claims 9 and 17 by offering to sell and selling in the United States the '414 Accused Products.  To the extent Claims 9 or 17 of the '414 Patent require a wireless transceiver as an element of the system or require reception by a wireless transceiver as a method step, the '414 Accused Products, including the software providing the MME, SGW, and PGW modules and the functionality to route calls from a first mobile device to a second mobile device, is, at a minimum, a material component of the systems and methods that infringe Claims 9 and 17 of the '414 Patent.  The software of the '414 Accused Products, which provides this functionality, is not a staple article or commodity of commerce suitable for substantial noninfringing use.  The function of the '414 Accused Products is to provide the accused networks, which infringe when they are operated, and they have no purpose without connection to wireless transceivers.  In particular, at least as of their

receipt of Lemko's original Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the '414 Patent, as discussed above. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '414 Patent, including Claims 9 and 17.

134.    Defendants' indirect infringement of the '414 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

135.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT V
## (Direct Infringement of the '988 Patent)

136.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

137.    Defendants have infringed and continue to infringe the '988 Patent, including at least exemplary Claims 22 and 42, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States infringing products including each of the following (the "'988 Accused Products"):

- Affirmed Mobile Core (infringes alone);

- Affirmed Networks' Mobile Content Cloud (MCC) (infringes alone);

- Affirmed Cloud Edge (ACE) (infringes alone);

- Affirmed UnityCloud (infringes alone); and

- Affirmed Private Network Service (APNS) (infringes alone).

138.    Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

139.    Defendants' acts of making, using, importing, selling, and offering for sale the '988 Accused Products have been without the permission, consent, authorization, or license of Lemko.

140.    To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.  Defendants act as the final assembler by configuring the final infringing system at the direction of their customers.  Defendants further act as the final assembler by selling products such as Affirmed Private Network Service as a "bundled, turnkey solution," which combines several products, as discussed above.  Exhibit 28 at 2-3.

141.    To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the '988 Accused Products.  Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the '988 Accused Products as a combination and provide services to manage and configure the '988 Accused Products as a combination.  Moreover, Defendants jointly control and put into service the '988 Accused Products.  For example, Defendants' market and sell Affirmed Private Network Service, which combines Affirmed Mobile Core with Azure Stack Edge.

142.    Defendants further directly infringe by directing and controlling the infringing systems, and obtain benefits from their control of the systems as a whole, for example, when Defendants configure and maintain the infringing systems as a paid service for their customers.

143.    Defendants' customers directly infringe by using and making (to the extent Defendants are the final assembler of the infringing system) the '988 Accused Products as an operating network.  As set forth with respect to Count VI, Defendants induce and contribute to their customers' direct infringement.

144.    The '988 Accused Products each provide a network communications system - with multiple Affirmed Mobile Cores (DMA servers), each Affirmed Mobile Core has private IP connection to the Affirmed Mobile Core-CP with a link to the Operator Core (DMAG server).  The Affirmed Mobile Core-CP with Operator Core connects the Internet and to legacy communications networks, such as common-carrier networks.  Exhibit 26 (unofficial transcript of Defendants' video available at https://www.youtube.com/watch?v=6WKYvMhJic8 at e.g., 12:58-15:09); Exhibit 25 at 152 (Chapter 7, p. 7).  The structure is illustrated schematically in the following diagram:





Excerpted from Defendants' video available at

https://www.youtube.com/watch?v=6WKYvMhJic8, at 2:20-3:15.

145. The Affirmed Mobile Core-UP (DMA) receives a call from the mobile device to a UE via the wireless transceiver and then sends that call data to the Affirmed Mobile Core-CP (DMAG). The Affirmed Mobile Core-CP - (i.e., the DMAG) sends the call data to the UE via the legacy communications network, such as AT&T's network or the network of other cellular providers. Exhibit 25 at 152 (Chapter 7, p. 7).

146. Defendants' infringement of the '988 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

147.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT VI
### (Indirect Infringement of the '988 Patent)

148.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

149.    As set forth with respect to Count V, Defendants' customers directly infringe the '988 Patent when they use or assemble the '988 Accused Products as an operating network. In addition to directly infringing the '988 Patent, as discussed above, Defendants have induced and contributed to their customers' direct infringement of the '988 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least exemplary Claims 22 and 42.

150.    Defendants know about the '988 Patent and that the '988 Accused Products infringe the '988 Patent, at least from their receipt of Lemko's February 14, 2022 Complaint and December 20, 2022 Preliminary Infringement Contentions, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

151.    Defendants knowingly and actively aided and abetted the direct infringement of the '988 Patent.  As discussed above, the '988 Accused Products infringe the '988 Patent through their provision of Affirmed Mobile Core functionality.  Defendants instruct and encourage their customers on how to use each of these core features of the '988 Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines,

videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the '988 Accused Products.

152.    For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '988 Accused Products in an infringing manner (as described above).  Exhibit 30 (https://azure.microsoft.com/en-us/support/community/).  Azure Community Support covers in-depth installing and configuring the '988 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '988 Accused Products' mobile edge computing and services features.

153.    Defendants also published numerous white papers that explain and identify the '988 Accused Products as working in the infringing manner and being configured in the infringing manner described above.  *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/).  Defendants provide product blog posts that cover the '988 Accused Products' infringing features and instruct customers on how to configure and use the '988 Accused Products in an infringing manner.  *See, e.g.,* Exhibit 32 (https://www.affirmednetworks.com/blog/).

154.    In addition, Defendants support customers' use and configuration of the '988 Accused Products through a dedicated support center.  Exhibit 33 (https://www.affirmednetworks.com/support/).

155.    Defendants are also liable for contributory infringement of the '988 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least exemplary Claims 22 and 42 by offering to sell and selling in the United States the '988 Accused Products.  To the extent Claims 22 or 42 of the

'988 Patent requires a third-party provided element to complete the system, the Affirmed

Mobile Core functionality, which Defendants provide, is, at a minimum, a material component

of the systems that infringe Claims 22 and 42 of the '988 Patent.  The software of the '988

Accused Products, which provides the Affirmed Mobile Core-UP (DMA) and Affirmed

Mobile Core-CP (DMAG) interface functionality, is not a staple article or commodity of

commerce suitable for substantial noninfringing use.  The function of the '988 Accused

Products is to provide the accused networks, which infringe when they are operated.  In

particular, at least as of their receipt of Lemko's original Complaint, Defendants know that

their Accused Products are particularly suited to be used in a manner that infringes the '988

Patent, as discussed above.  Defendants therefore know or are willfully blind to the fact that

they are contributing to the infringement of one or more claims of the '988 Patent, including

Claims 22 and 42.

156.    Defendants' indirect infringement has caused and is continuing to cause damage

and irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable

injury unless and until that infringement is enjoined by the Court.

157.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive

relief, damages, and attorney's fees and costs.

## COUNT VII
### (Direct Infringement of the '409 Patent)

158.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth

herein, the allegations of the preceding paragraphs, as set forth above.

159.    Defendants have infringed and continue to infringe the '409 Patent, including at

least exemplary Claims 1 and 26, in violation of 35 U.S.C. § 271(a) by, among other things,

making, using, importing, selling, and offering for sale in the United States infringing products including each of the following (the "'409 Accused Products"):

- Affirmed Mobile Core (infringes alone or in combination with an ASE);

- Affirmed Networks' Mobile Content Cloud (MCC) (infringes alone or in combination with an ASE);

- Affirmed Cloud Edge (ACE) (infringes alone or in combination with an ASE);

- Affirmed UnityCloud (infringes alone or in combination with an ASE);

- Affirmed Private Network Service (APNS) (infringes alone and includes an ASE); and

- Each of the above in combination with Affirmed Networks' vProbe.

160.    Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

161.    Defendants' acts of making, using, importing, selling, and offering for sale the '409 Accused Products have been without the permission, consent, authorization, or license of Lemko.

162.    To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.  Defendants act as the final assembler by configuring the final infringing system at the direction of their customers.  Defendants further act as the final assembler by selling products such as Affirmed Private Network Service as a "bundled, turnkey solution," which combines several products, as discussed above.  Exhibit 28 at 2-3.  Defendants sell vProbe exclusively for use in combination with the other '409 Accused Products.

163.    To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to

making, using, importing, selling, and offering for sale the '409 Accused Products. Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the '409 Accused Products as a combination and provide services to manage and configure the '409 Accused Products as a combination. Moreover, Defendants jointly control and put into service the '409 Accused Products. For example, Defendants' market and sell Affirmed Private Network Service, which combines Affirmed Mobile Core with Azure Stack Edge.

164.    Defendants further directly infringe by directing and controlling the infringing systems, and obtain benefits from their control of the systems as a whole, for example, when Defendants configure and maintain the infringing systems as a paid service for their customers.

165.    Defendants' customers directly infringe by using and making (to the extent Defendants are the final assembler of the infringing system) the '409 Accused Products as an operating network. As set forth with respect to Count VIII, Defendants induce and contribute to their customers' direct infringement.

166.    The '409 Accused Products each provide a DMAG to support "a virtualized architecture" in MEC to provide mobile networking. Exhibit 24 at 2. Each of the '409 Accused Products provides for communications with a legacy communication network through a network interface.

167.    For example, vEPC supports an offline charging interface adapted to communicate with a legacy network, such as GPRS Tunneling Protocol Prime ("GTPP"), which is a legacy network interface adapted to communicate with a legacy communication network, such as AT&T's network or the network of other cellular providers. Exhibit 25 at 253, 257 (Chapter 9, p. 16, 20). This permits calls routed by the DMAG to be communicated via the legacy network interface.

168.     vEPC provides "high performance, scalable, cost-effective vEPC functions," including HSS, MME, and AAA, to receive registration information from subscribers on DMA nodes to enable routing of calls served by the DMA nodes.  Exhibit 35 at 1.  vEPC delivers "a full stack of 4G/5G gateway and mobility functions" that are 3GPP standard compliant to route calls by the first group of DMA nodes.  Exhibit 11 at 3.

169.     The HSS registers the second group of DMA nodes when they are roaming with respect to the DMAG to allow temporary routing of calls to mobile devices served by the second group of DMA nodes.  Based on "the peer's status and the subscriber's local home/visiting status," a subscriber is classified as "Home, Roam-in, or Roam-out."   Exhibit 25 at 172 (Chapter 7, p. 27).  A peer can be classified as "local (same administrative domain) or remote (different administrative domain)" based on GTP classification.  *Id.* at 173 (Chapter 7, p. 28).

170.     Through gateway service, the DMAG can route communications directed to the mobile stations served by the second DMA node.  The SGW acts as "a mobility anchor point and routes data between the eNodeB base station and the [Packet Data Network (PDN)] gateway."  Exhibit 35 at 5.  The DMAG receives and records performance data and can provide it to additional DMAGs via a private IP network.

171.     Affirmed Networks' vProbe is a master agent adapted to receive performance data from each DMA node of the first group of DMA nodes and each DMA node of the second group of DMA nodes.  Affirmed vProbe is "co-located with the Affirmed's Mobile Content Cloud vEPC and WiFi Solutions rather than delivered as a separate network appliance" to record data for each DMA node.  Exhibit 36 at 1.



Exhibit 17 at 3.

172.     Affirmed vProbe provides an operations module to report "session control, subscriber events and subscriber data selectively through user-defined filtering" including vControl Flow (collection of all control plane traffic) and vData Flow (user defined filtering of data plane traffic).  Exhibit 36 at 2.

173.     Affirmed vProbe stores Intelligent Event Data Records ("iEDRs"), "[c]omplete granular data capture of session, bearer, flow, and transaction details in the data and control plane," in storage device.  Exhibit 37 at 8.  The iEDR hierarchy is shown below:



*Id.* (showing the iEDRs stored in hierarchy for deep packet probe).

174.    Virtual Monitoring through Affirmed vProbe is necessary to "address the dynamic management of mobility, policies, data bearers and the interoperability with legacy 3G/2G systems."  Exhibit 37 at 12.  The performance data is sent to an additional DMAG via a private IP network because the "EPC is a high-performance, high-capacity, all-IP core network."  *Id.*

175.    Finally, the vEPC's MME provides gateway selection within the EPC, performing "signaling and selection of legacy gateways for handovers to other 2G/3G networks," with the legacy networks routing a portion of the calls by DMAG.  Exhibit 37 at 12.

176.    Defendants sell ASE servers, which host the '409 Accused Products' software and serve as a data storage device.  In addition, when Defendants sell the '409 Accused Products as cloud-hosted products or as a service (where Defendants host the '409 Accused Products), they operate on Defendants' servers that are data storage devices.

177.    Defendants' infringement of the '409 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.  Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

178.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT VIII
### (Indirect Infringement of the '409 Patent)

179.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

180.    As set forth with respect to Count VII, Defendants' customers directly infringe the '409 Patent when they use or assemble the '409 Accused Products as an operating network. In addition to directly infringing the '409 Patent, as discussed above, Defendants have induced and contributed to their customers' direct infringement of the '409 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least exemplary Claims 1 and 26.

181.    Defendants know about the '409 Patent and that the '409 Accused Products infringe the '409 Patent, at least from their receipt of Lemko's February 14, 2022 Complaint and December 20, 2022 Preliminary Infringement Contentions, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

182.    Defendants knowingly and actively aided and abetted the direct infringement of the '409 Patent.  As discussed above, the '409 Accused Products infringe the '409 Patent

through their provision of DMAG, call routing, and performance data monitoring functionality. Defendants instruct and encourage their customers on how to use each of these core features of the '409 Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the '409 Accused Products.

183.    For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '409 Accused Products in an infringing manner (as described above).  Exhibit 30 (https://azure.microsoft.com/en-us/support/community/).  Azure Community Support covers in-depth installing and configuring the '409 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '409 Accused Products' mobile edge computing and services features.

184.    Defendants also published numerous white papers that explain and identify the '409 Accused Products as working in the infringing manner and being configured in the infringing manner described above.  *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/).  Defendants provide product blog posts that cover the '409 Accused Products' infringing features and instruct customers on how to configure and use the '409 Accused Products in an infringing manner.  *See, e.g.,* Exhibit 32 (https://www.affirmednetworks.com/blog/).

185.    In addition, Defendants support customers' use and configuration of the '409 Accused Products through a dedicated support center.  Exhibit 33 (https://www.affirmednetworks.com/support/).

186.     Defendants are also liable for contributory infringement of the '409 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least exemplary Claims 1 and 26 by offering to sell and selling in the United States the '409 Accused Products.  To the extent Claims 1 or 26 of the '409 Patent requires a server element, the DMAG, call routing, and performance monitoring software, which Defendants provide, is, at a minimum, a material component of the systems that infringe Claims 1 and 22 of the '409 Patent.  The software of the '409 Accused Products, which provides these functions is not a staple article or commodity of commerce suitable for substantial noninfringing use.  The function of the '409 Accused Products is to provide the accused networks, which infringe when they are operated, and they have no purpose without being operated on a server with data storage.  In particular, at least as of their receipt of Lemko's original Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the '409 Patent, as discussed above.  Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '409 Patent, including Claims 1 and 22.

187.     Defendants' indirect infringement of the '409 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

188.     Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT IX
### (Direct Infringement of the '111 Patent)

189.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

190.    Defendants have infringed and continue to infringe the '111 Patent, including at least exemplary Claim 15, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States infringing products including each of the following (the "'111 Accused Products"):

- Affirmed Mobile Core (infringes alone);

- Affirmed Networks' Mobile Content Cloud (MCC) (infringes alone);

- Affirmed Cloud Edge (ACE) (infringes alone);

- Affirmed UnityCloud (infringes alone); and

- Affirmed Private Network Service (APNS) (infringes alone).

191.    Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

192.    Defendants' acts of making, using, importing, selling, and offering for sale the '111 Accused Products have been without the permission, consent, authorization, or license of Lemko.

193.    To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.  Defendants act as the final assembler by configuring the final infringing system at the direction of their customers.  Defendants further act as the final assembler by selling products such as Affirmed Private Network Service as a "bundled, turnkey solution," which combines several products, as discussed above.  Exhibit 28 at 2-3.

194.    To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the '111 Accused Products.  Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the '111 Accused Products as a combination and provide services to manage and configure the '111 Accused Products as a combination.  Moreover, Defendants jointly control and put into service the '111 Accused Products.  For example, Defendants' market and sell Affirmed Private Network Service, which combines Affirmed Mobile Core with Azure Stack Edge.

195.    Defendants further directly infringe by directing and controlling the infringing systems, and obtain benefits from their control of the systems as a whole, for example, when Defendants configure and maintain the infringing systems as a paid service for their customers.

196.    Defendants' customers directly infringe by using and making (to the extent Defendants are the final assembler of the infringing system) the '111 Accused Products as an operating network.  As set forth with respect to Count X, Defendants induce and contribute to their customers' direct infringement.

197.    The following figure illustrates how each of the '111 Accused Products satisfies Claim 15 of the '111 Patent.





Excerpted from Defendants' video available at

https://www.youtube.com/watch?v=6WKYvMhJic8.

198.    There are two DMA systems.  Each DMA system is comprised of the components of the EPC (evolved packet core), including the MME, SGW, PGW and HSS functions of the '111 Accused Products.  The MMEs of both DMA systems are connected to an HSS (i.e., the HLR).  The first mobile subscriber is in the wireless coverage area of the first DMA system.  The second mobile subscriber is in the wireless coverage area of the second DMA system.

199.    With the '111 Accused Products, a call from the first mobile subscriber to the second mobile subscriber begins in the first wireless coverage area.  The call is received at the first DMA system.  When the call is received at the first DMA system, it must determine where the second mobile subscriber is located so that the call can be routed appropriately.

200.    The HSS in each DMA system is the authentication, authorization, and accounting (AAA) module.  The HSS functionality is distributed with the HSS of both the first and second DMA system holding information for users connected to their respective DMA systems as well as connected to the other DMA system (via the Community Location Register, or CLR).  Exhibit 28 at 4 ("APNS delivers seamless mobility across multiple enterprise sites through its distributed subscriber core and provides full mobility between private and public networks.").  The CLR is used to determine if the second mobile subscriber is registered with the first or second DMA system.

201.    Once the destination of the call is determined to be a mobile subscriber registered with the second DMA system, the MME of each DMA system establishes a connection for the call data through the SGW and PGW of each respective system.  Thus, the call is connected from the first mobile subscriber through the first DMA system to the second

mobile subscriber through the second DMA system (with the external network being the intermediary).

202.    Defendants' infringement of the '111 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.  Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

203.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT X
### (Indirect Infringement of the '111 Patent)

204.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

205.    As set forth with respect to Count IX, Defendants' customers directly infringe the '111 Patent when they use or assemble the '111 Accused Products as an operating network. In addition to directly infringing the '111 Patent, as discussed above, Defendants have induced and contributed to their customers' direct infringement of the '111 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products performing the method of at least exemplary Claim 15.

206.    Defendants know about the '111 Patent and that the '111 Accused Products infringe the '409 Patent, at least from their receipt of Lemko's February 14, 2022 Complaint and December 20, 2022 Preliminary Infringement Contentions, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

60

207.    Defendants knowingly and actively aided and abetted the direct infringement of the '111 Patent.  As discussed above, the '111 Accused Products infringe the '111 Patent through their provision of software providing the EPC, MME, SGW, and PGW functionality. Defendants instruct and encourage their customers on how to use each of these core features of the '111 Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the '111 Accused Products.

208.    For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '111 Accused Products in an infringing manner (as described above).  Exhibit 30 (https://azure.microsoft.com/en-us/support/community/).  Azure Community Support covers in-depth installing and configuring the '111 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '111 Accused Products' mobile edge computing and services features.

209.    Defendants also published numerous white papers that explain and identify the '111 Accused Products as working in the infringing manner and being configured in the infringing manner described above.  *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/).  Defendants provide product blog posts that cover the '111 Accused Products' infringing features and instruct customers on how to configure and use the '111 Accused Products in an infringing manner.  *See, e.g.,* Exhibit 32 (https://www.affirmednetworks.com/blog/).

210.    In addition, Defendants support customers' use and configuration of the '111 Accused Products through a dedicated support center.  Exhibit 33 (https://www.affirmednetworks.com/support/).

211.    Defendants are also liable for contributory infringement of the '111 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least exemplary Claim 15 by offering to sell and selling in the United States the '111 Accused Products.  To the extent Claim 15 of the '111 Patent requires reception by a wireless transceiver as a step of the method, the first and second DMA server, which Defendants provide, is, at a minimum, a material component of the systems that perform the method infringing exemplary Claim 15 of the '111 Patent.  The software of the '111 Accused Products, which provides the first and second DMA server, is not a staple article or commodity of commerce suitable for substantial noninfringing use.  The function of the '111 Accused Products is to provide the accused networks, which infringe when they are operated, and they have no purpose without connection to wireless transceivers.  In particular, at least as of their receipt of Lemko's original Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the '111 Patent, as discussed above.  Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '111 Patent, including Claim 15.

212.    Defendants' indirect infringement of the '111 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

213.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

<u>COUNT XI</u>
**(Direct Infringement of the '980 Patent)**

214.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

215.    Defendants have infringed and continue to infringe the '980 Patent, including at least exemplary Claims 1 and 15, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States infringing products including each of the following (the "'980 Accused Products"):

- Affirmed Mobile Core (infringes alone);

- Affirmed Networks' Mobile Content Cloud (MCC) (infringes alone);

- Affirmed Cloud Edge (ACE) (infringes alone);

- Affirmed UnityCloud (infringes alone);

- Affirmed Private Network Service (APNS) (infringes alone).

216.    Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

217.    Defendants' acts of making, using, importing, selling, and offering for sale the '980 Accused Products have been without the permission, consent, authorization, or license of Lemko.

218.    To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.  Defendants act as the final assembler by configuring the final infringing system at the direction of their customers.  Defendants further act as the final assembler by

selling products such as Affirmed Private Network Service as a "bundled, turnkey solution," which combines several products, as discussed above.  Exhibit 28 at 2-3.

219.    To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the '980 Accused Products.  Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the '980 Accused Products as a combination and provide services to manage and configure the '980 Accused Products as a combination.  Moreover, Defendants jointly control and put into service the '980 Accused Products.  For example, Defendants' market and sell Affirmed Private Network Service, which combines Affirmed Mobile Core with Azure Stack Edge.

220.    Defendants further directly infringe by directing and controlling the infringing systems, and obtain benefits from their control of the systems as a whole, for example, when Defendants configure and maintain the infringing systems as a paid service for their customers.

221.    Defendants' customers directly infringe by using and making (to the extent Defendants are the final assembler of the infringing system) the '980 Accused Products as an operating network.  As set forth with respect to Count XII, Defendants induce and contribute to their customers' direct infringement.

222.    Each of the '980 Accused Products infringe at least exemplary Claims 1 and 15. The following figure illustrates the infringing configuration:



Excerpted from Defendants' video available at

https://www.youtube.com/watch?v=6WKYvMhJic8.

223.    DMA Servers, labeled as "Affirmed Mobile Core – UP" on the figure, exist at the Operator Edge and are communicatively coupled to a DMA Gateway (DMAG), identified as "Affirmed Mobile Core – CP" on the figure, in the Operator Core.  As shown on the figure, each DMAG is communicatively coupled to a plurality of DMA Servers.  Calls originating from a mobile device (shown here running one of multiple exemplary applications – V2V, or Vehicle-to-Vehicle, smart city sensors, or gaming devices) are received at the BTS/eNodeB interface of a first DMA Server.  These devices had previously registered with the DMA Server using the Initial Attach procedure with the registration data stored in the HSS of each corresponding DMA Server.  The DMA Server, based on the registration data it has stored,

determines that the destination device is not in its wireless coverage area and so it routes the packetized call data to the DMAG in the Operator Core. The DMAG, in turn, routes the call data to the destination device connected to a second DMA Server based on registration data stored at the DMAG.

224.    Defendants' infringement of the '980 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.  Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

225.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT XII**
**(Indirect Infringement of the '980 Patent)**

226.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

227.    As set forth with respect to Count XI, Defendants' customers directly infringe the '980 Patent when they use or assemble the '980 Accused Products as an operating network. In addition to directly infringing the '980 Patent, as discussed above, Defendants have induced and contributed to their customers' direct infringement of the '980 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least exemplary Claims 1 and 15.

228.    Defendants know about the '980 Patent and that the '980 Accused Products infringe the '980 Patent, at least from their receipt of Lemko's February 14, 2022 Complaint and December 20, 2022 Preliminary Infringement Contentions, as well as from Lemko's patent

markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

229.    Defendants knowingly and actively aided and abetted the direct infringement of the '980 Patent.  As discussed above, the '980 Accused Products infringe the '980 Patent through their Affirmed Mobile Core – UP and Affirmed Mobile Core – CP functionality. Defendants instruct and encourage their customers on how to use each of these core features of the '980 Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the '980 Accused Products.

230.    For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '980 Accused Products in an infringing manner (as described above).  Exhibit 30 (https://azure.microsoft.com/en-us/support/community/).  Azure Community Support covers in-depth installing and configuring the '980 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '980 Accused Products' mobile edge computing and services features.

231.    Defendants also published numerous white papers that explain and identify the '980 Accused Products as working in the infringing manner and being configured in the infringing manner described above.  *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/).  Defendants provide product blog posts that cover the '980 Accused Products' infringing features and instruct customers on

how to configure and use the '980 Accused Products in an infringing manner. *See, e.g.,* Exhibit 32 (https://www.affirmednetworks.com/blog/).

232.    In addition, Defendants support customers' use and configuration of the '980 Accused Products through a dedicated support center.  Exhibit 33 (https://www.affirmednetworks.com/support/).

233.    Defendants are also liable for contributory infringement of the '980 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least exemplary Claims 1 and 15 by offering to sell and selling in the United States the '980 Accused Products.  To the extent Claims 1 and 15 of the '980 Patent require operation of a wireless transceiver connected to the eNodeB or base transceiver station, the software providing the Affirmed Mobile Core functionality, which Defendants provide, is, at a minimum, a material component of the systems that infringe Claims 1 and 15 of the '980 Patent.  The software of the '980 Accused Products, which provide the Affirmed Mobile Core functionality, is not a staple article or commodity of commerce suitable for substantial noninfringing use.  The function of the '980 Accused Products is to provide the accused networks, which infringe when they are operated, and they have no purpose without connection to wireless transceivers.  In particular, at least as of their receipt of Lemko's original Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the '980 Patent, as discussed above.  Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '980 Patent, including Claims 1 and 15.

234.    Defendants' indirect infringement of the '980 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.

Defendants' indirect infringement has caused and is continuing to cause damage and irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

235.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

<u>**COUNT XIII**</u>
**(Direct Infringement of the '478 Patent)**

236.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

237.    Defendants have infringed and continue to infringe the '478 Patent, including at least exemplary Claims 1 and 16, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States infringing products including each of the following (the "'478 Accused Products"):

- Affirmed Mobile Core (infringes alone);

- Affirmed Networks' Mobile Content Cloud (MCC) (infringes alone);

- Affirmed Cloud Edge (ACE) (infringes alone);

- Affirmed UnityCloud (infringes alone);

- Affirmed Private Network Service (APNS) (infringes alone).

238.    Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

239.    Defendants' acts of making, using, importing, selling, and offering for sale the '478 Accused Products have been without the permission, consent, authorization, or license of Lemko.

240.    To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the infringing system.  Defendants act as the final assembler by configuring the final infringing system at the direction of their customers.  Defendants further act as the final assembler by selling products such as Affirmed Private Network Service as a "bundled, turnkey solution," which combines several products, as discussed above.  Exhibit 28 at 2-3.

241.    To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the '478 Accused Products.  Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the '478 Accused Products as a combination and provide services to manage and configure the '478 Accused Products as a combination.  Moreover, Defendants jointly control and put into service the '478 Accused Products.  For example, Defendants' market and sell Affirmed Private Network Service, which combines Affirmed Mobile Core with Azure Stack Edge.

242.    Defendants further directly infringe by directing and controlling the infringing systems, and obtain benefits from their control of the systems as a whole, for example, when Defendants configure and maintain the infringing systems as a paid service for their customers.

243.    Defendants' customers directly infringe by using and making (to the extent Defendants are the final assembler of the infringing system) the '478 Accused Products as an operating network.  As set forth with respect to Count XIV, Defendants induce and contribute to their customers' direct infringement.

244.    The following diagram illustrates how each of the '478 Accused Products meet at least exemplary Claims 1 and 16 of the '478 Patent.



Excerpted from Defendants' video available at

https://www.youtube.com/watch?v=6WKYvMhJic8.

245.    DMA Servers, labeled as "Affirmed Mobile Core – UP" on the figure above,

exist at the Operator Edge and are communicatively coupled to a DMA Gateway (DMAG),

identified as "Affirmed Mobile Core – CP" on the figure, in the Operator Core.  As shown in

the figure, each DMAG is communicatively coupled to a plurality of DMA Servers.  Each

DMAG has a plurality of interfaces including an interface to legacy communications networks

(such as common-carrier networks), a private IP interface to the DMA Server, and a third

interface to connect to peer DMAGs (the DMA gateway communication network).

246.    Each DMAG communicates information to the other DMAGs (in the Operator

Core) identifying the plurality of DMA Servers connected to it and the corresponding devices

connected to those DMA Servers.  When a communication from an application (such as the

exemplary applications shown on the figure – V2V, or Vehicle-to-Vehicle, smart city sensors,

or gaming devices) is received at a second DMAG with the destination device connected to a DMA Server which is connected to a first DMAG, the second DMAG routes the communication to the destination device via the first DMAG through the DMA gateway communication network.

247.    Defendants' infringement of the '478 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.  Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

248.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

<strong><u>COUNT XIV</u></strong><br><strong>(Indirect Infringement of the '478 Patent)</strong>

249.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

250.    As set forth with respect to Count III, Defendants' customers directly infringe the '478 Patent when they use or assemble the '478 Accused Products as an operating network. In addition to directly infringing the '478 Patent, as discussed above, Defendants have induced and contributed to their customers' direct infringement of the '478 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least exemplary Claims 1 and 16.

251.    Defendants know about the '478 Patent and that the '478 Accused Products infringe the '478 Patent, at least from their receipt of Lemko's February 14, 2022 Complaint and December 20, 2022 Preliminary Infringement Contentions, as well as from Lemko's patent

markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

252.    Defendants knowingly and actively aided and abetted the direct infringement of the '478 Patent.  As discussed above, the '478 Accused Products infringe the '478 Patent through their provision of the Affirmed Mobile Core – UP and Affirmed Mobile Core – CP functionality.  Defendants instruct and encourage their customers on how to use each of these core features of the '478 Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the '478 Accused Products.

253.    For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '478 Accused Products in an infringing manner (as described above).  Exhibit 30 (https://azure.microsoft.com/en-us/support/community/).  Azure Community Support covers in-depth installing and configuring the '478 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '478 Accused Products' mobile edge computing and services features.

254.    Defendants also published numerous white papers that explain and identify the '478 Accused Products as working in the infringing manner and being configured in the infringing manner described above.  *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/).  Defendants provide product blog posts that cover the '478 Accused Products' infringing features and instruct customers on

how to configure and use the '478 Accused Products in an infringing manner. *See, e.g.,* Exhibit 32 (https://www.affirmednetworks.com/blog/).

255.    In addition, Defendants support customers' use and configuration of the '478 Accused Products through a dedicated support center. Exhibit 33 (https://www.affirmednetworks.com/support/).

256.    Defendants are also liable for contributory infringement of the '478 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least exemplary Claims 1 and 16 by offering to sell and selling in the United States the '478 Accused Products. To the extent Claims 1 or 16 of the '478 Patent require operation of a wireless transceiver connected to the eNodeB, the software providing the Affirmed Mobile Core functionality, which Defendants provide, is, at a minimum, a material component of the systems that infringe Claim 1 of the '478 Patent. The software of the '478 Accused Products, which provides the MME, SGW, and PGW functionality, is not a staple article or commodity of commerce suitable for substantial noninfringing use. The function of the '478 Accused Products is to provide the accused networks, which infringe when they are operated, and they have no purpose without connection to wireless transceivers. In particular, at least as of their receipt of Lemko's original Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the '478 Patent, as discussed above. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '478 Patent, including Claims 1 and 16.

257.    Defendants' indirect infringement of the '478 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.

Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

258.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## COUNT XV
### (Direct Infringement of the '931 Patent)

259.    Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

260.    Defendants have infringed and continue to infringe the '931 Patent, including at least exemplary Claims 7 and 12, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States infringing products including each of the following (the "'931 Accused Products"):

- Affirmed Mobile Core (infringes alone);

- Affirmed Networks' Mobile Content Cloud (MCC) (infringes alone);

- Affirmed Cloud Edge (ACE) (infringes alone);

- Affirmed UnityCloud (infringes alone);

- Affirmed Private Network Service (APNS) (infringes alone).

261.    Defendants' infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

262.    Defendants' acts of making, using, importing, selling, and offering for sale the '931 Accused Products have been without the permission, consent, authorization, or license of Lemko.

263.    To the extent any components of the claimed systems are provided by Defendants' customers, Defendants directly infringe by acting as the final assembler of the

infringing system.  Defendants act as the final assembler by configuring the final infringing system at the direction of their customers.  Defendants further act as the final assembler by selling products such as Affirmed Private Network Service as a "bundled, turnkey solution," which combines several products, as discussed above.  Exhibit 28 at 2-3.

264.    To the extent Microsoft and Affirmed Networks each provide components of the Accused Products, they directly infringe by operating as a joint enterprise with respect to making, using, importing, selling, and offering for sale the '931 Accused Products.  Affirmed Networks is a subsidiary of Microsoft, and Defendants cooperate to sell and market the '931 Accused Products as a combination and provide services to manage and configure the '931 Accused Products as a combination.  Moreover, Defendants jointly control and put into service the '931 Accused Products.  For example, Defendants' market and sell Affirmed Private Network Service, which combines Affirmed Mobile Core with Azure Stack Edge.

265.    Defendants further directly infringe by directing and controlling the infringing systems, and obtain benefits from their control of the systems as a whole, for example, when Defendants configure and maintain the infringing systems as a paid service for their customers.

266.    Defendants' customers directly infringe by using and making (to the extent Defendants are the final assembler of the infringing system) the '931 Accused Products as an operating network.  As set forth with respect to Count XVI, Defendants induce and contribute to their customers' direct infringement.

267.    Each of the '931 Accused Products provides GGSN/SGSN, SGW, PGW, MME, AMF/SMF, and TWAG/ePDG functionality, operating as a first and second DMAG.  The '931 Accused Products include operation determination module functionality that monitors the DMAGs, detects failure conditions and, in the event of a failure of a first DMAG, will notify a

second DMAG to take over for the first DMAG for routing calls and will notify external systems to connect calls via the second DMAG instead of the first DMAG.

268.     For example, the '931 Accused Products include Affirmed Networks' Acuitas function to "navigate, monitor, and manage mobile functions and services." Exhibit 25 at 58 (Chapter 1, p. 19). Acuitas detects failures in the DMAG. *Id.* at 60 (Chapter 2, p. 1). It "can monitor faults, alarms, performance statistics, provision and configure services, and perform software updates on any system." *Id.* at 60. It "[p]rovides reports based on fault, performance, and analytic data collected from the system that can be used to monitor the behavior of the device." *Id.* at 61 (Chapter 2, p. 2).

269.     In addition, the Acuitas function of the '931 Accused Products provides a Geographic Redundancy Group solution, which is based on "collaborative system of two geographically-separated chassis functioning as standby partners for each other." Exhibit 25 at 72 (Chapter 2, p. 13). A Geographic Redundancy group has "a designated primary and a designated secondary system," which correspond to a first and second DMAG. *Id.* Each group represents "a set of services with an active representation on the primary node and a standby representation on the secondary node." *Id.* If the active node is out of commission, the services on the standby node can be enabled "so these services can resume," by routing calls through the second DMAG instead of the first DMAG. *Id.* The Acuitas Geographic Redundancy Manager application manages and monitors Geographic Redundancy groups, receiving data to detect a failure condition. *Id.* at 144-145 (Chapter 6, p. 4).

> The redundancy group supports the following HA modes:
>
> - *warm-manual* – No session synchronization occurs between nodes. Failovers are Operator controlled.
>
> - *hot-auto* – Synchronization of per-session data occurs between nodes. Failovers are automatically triggered based on network health monitoring results. In addition, failovers can be Operator controlled (using revert).
>
> - *hot-manual* – Synchronization of per-session data occurs between nodes. Failovers are Operator controlled.

Exhibit 25 at 144 (Chapter 6, p. 3)

270.    In addition, the AAA interface functionality in the '931 Accused Products "uses the RADIUS Request Timeout feature for failover support and uses the RADIUS Health Check feature for failure detection," allowing for calls to be routed through the second DMAG instead of the first DMAG.  *Id*. at 259 (Chapter 9, p. 22).

> *RADIUS Health Check* – The system uses the RADIUS Health Check feature to detect a non-responsive remote RADIUS server peer using a counter to track the number of consecutive unanswered requests (server-dead-num-attempts) for a given peer. If the number of consecutive unanswered requests is reached on a particular peer, the system:
>
> - Marks the peer as down
>
> - Generates a TRAP
>
> - Starts the dead server declare timer (server-dead-timeout-value)

*Id*. at 259 (Chapter 9, p. 22)

271.    As a further example of the '931 Accused Products ability to substitute a second DMAG for a first DMAG for call routing, GTP (GPRS Tunneling Protocol) peers associated use an overload control function to detect "overload on peer servers and any potential network issues on the access network to peer servers." *Id*. at 175 (Chapter 7, p. 30).  This feature "detects any potential transient failure conditions by reducing the message load on the peer

interface" and also detects "overload on peer servers by enforcing a maximum messaging rate." *Id.*



*Id.* at 176.

272.    As a yet further example of the '931 Accused Products ability to substitute a second DMAG for a first DMAG for call routing, the initial Inter-nodal Congestion Control feature detects "the load status of SGW and PGW and the failure status of PGW" to pass to an MME and subsequent usage of that status when selecting SGW and PGW.  Exhibit 27 at 41. This feature allows the MME to "remove a PGW IP address from selection for new sessions for a period of time," and thereby route through a second DMAG.  *Id.*



*Id.*

273.     Defendants' infringement of the '931 Patent has injured and continue to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.  Defendants' infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

274.     Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

<u>**COUNT XVI**</u>
**(Indirect Infringement of the '931 Patent)**

275.     Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

276.     As set forth with respect to Count XV, Defendants' customers directly infringe the '931 Patent when they use or assemble the '931 Accused Products as an operating network. In addition to directly infringing the '931 Patent, as discussed above, Defendants have induced and contributed to their customers' direct infringement of the '931 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Accused Products as a system infringing at least exemplary Claims 7 and 12.

277.     Defendants know about the '931 Patent and that the '931 Accused Products infringe the '931 Patent, at least from their receipt of Lemko's February 14, 2022 Complaint and December 20, 2022 Preliminary Infringement Contentions, as well as from Lemko's patent markings and from Mr. Taylor and others at Metaswitch Networks who investigated and met with Lemko.

278.    Defendants knowingly and actively aided and abetted the direct infringement of the '931 Patent.  As discussed above, the '931 Accused Products infringe the '931 Patent through their provision of GGSN/SGSN, SGW, PGW, MME, AMF/SMF, TWAG/ePDG, and Acuitas functionality.  Defendants instruct and encourage their customers on how to use each of these core features of the '931 Accused Products, including through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, which are all intended to enable and encourage the infringing use and installation of the '931 Accused Products.

279.    For example, Defendants operate an online site called "Azure Community Support," with discussions and articles covering the use of the '931 Accused Products in an infringing manner (as described above).  Exhibit 30 (https://azure.microsoft.com/en-us/support/community/).  Azure Community Support covers in-depth installing and configuring the '931 Accused Products, and includes tutorials, articles, support tickets, Q&A, and exchanges of ideas regarding the '931 Accused Products' mobile edge computing and services features.

280.    Defendants also published numerous white papers that explain and identify the '931 Accused Products as working in the infringing manner and being configured in the infringing manner described above.  *See, e.g.*, Exhibit 31 (https://www.affirmednetworks.com/asset-type/white-papers/).  Defendants provide product blog posts that cover the '931 Accused Products' infringing features and instruct customers on how to configure and use the '931 Accused Products in an infringing manner.  *See, e.g.,* Exhibit 32 (https://www.affirmednetworks.com/blog/).

281.    In addition, Defendants support customers' use and configuration of the '931 Accused Products through a dedicated support center.  Exhibit 33 (https://www.affirmednetworks.com/support/).

282.    Defendants are also liable for contributory infringement of the '931 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that they are contributing to infringement of at least exemplary Claims 7 and 12 by offering to sell and selling in the United States the '931 Accused Products.  To the extent Claims 7 and 12 of the '931 Patent require an element not provided by Defendants, Defendants' software including the GGSN/SGSN, SGW, PGW, MME, AMF/SMF, TWAG/ePDG, and Acuitas functionality is, at a minimum, a material component of the systems that infringe Claims 7 and 12 of the '931 Patent.  The software of the '931 Accused Products, which provides the GGSN/SGSN, SGW, PGW, MME, AMF/SMF, TWAG/ePDG, and Acuitas functionality, is not a staple article or commodity of commerce suitable for substantial noninfringing use.  The function of the '931 Accused Products is to provide the accused networks, which infringe when they are operated, and they have no purpose without connection to wireless transceivers.  In particular, at least as of their receipt of Lemko's original Complaint, Defendants know that their Accused Products are particularly suited to be used in a manner that infringes the '931 Patent, as discussed above. Defendants therefore know or are willfully blind to the fact that they are contributing to the infringement of one or more claims of the '931 Patent, including Claims 7 and 12.

283.    Defendants' indirect infringement has caused and is continuing to cause damage and irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

284.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Lemko prays for judgment and relief as follows:

A.    An entry of judgment holding that Defendants have infringed and are infringing the '763, '414, '988, '409, '111, '980, '478, and '931 Patents; and have induced infringement and are inducing infringement of the '763, '414, '988, '409, '111, '980, '478, and '931 Patents; and/or have contributorily infringed and continues to contribute to infringement of the '763, '414, '988, '409, '111, '980, '478, and '931 Patents;

B.    A preliminary and permanent injunction against Defendants and their officers, employees, agents, servants, attorneys, instrumentalities, and/or those in privity with them, from infringing, or inducing the infringement of the '763, '414, '988, '409, '111, '980, '478, and '931 Patents and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

C.    An award to Lemko of such damages as it shall prove at trial against Defendants that is adequate to fully compensate Lemko for Defendants' infringement of the '763, '414, '988, '409, '111, '980, '478, and '931 Patents, said damages to be no less than a reasonable royalty;

D.    An award to Lemko of enhanced damages under 35 U.S.C. § 284;

E.    A finding that this case is "exceptional" and an award to Lemko of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

F.    An accounting of all infringing sales and revenues, together with post judgment interest and prejudgment interest from the first date of infringement of the '763, '414, '988, '409, '111, '980, '478, and '931 Patents; and

G.      Such further and other relief as the Court may deem proper and just.


                              Respectfully submitted,


Dated: October 19, 2023       *s/ Aaron Frankel*
                              Aaron Frankel (*pro hac vice*)
                              **KRAMER LEVIN NAFTALIS
                                & FRANKEL LLP**
                              1177 Avenue of the Americas
                              New York, NY 10036
                              Telephone: (212) 715-7793
                              afrankel@kramerlevin.com

                              Paul Andre (*pro hac vice*)
                              Lisa Kobialka (*pro hac vice*)
                              James Hannah (*pro hac vice*)
                              **KRAMER LEVIN NAFTALIS
                                & FRANKEL LLP**
                              333 Twin Dolphin Drive, Suite 700
                              Redwood Shores, CA 94065
                              Telephone: (650)- 752-1700
                              Facsimile: (650) 752-1800
                              pandre@kramerlevin.com
                              lkobialka@kramerlevin.com
                              jhannah@kramerlevin.com

                              Jon B. Hyland (Bar Number: 24046131)
                              jhyland@hilgersgraben.com
                              Grant Schmidt (Bar. Number: 24084579)
                              gschmidt@hilgersgraben.com
                              **HILGERS GRABEN PLLC**
                              7859 Walnut Hill Lane, Suite 335
                              Dallas, TX 75230
                              Telephone: 972-645-3097

                              *Attorneys for Plaintiff*
                              Lemko Corporation

## DEMAND FOR JURY TRIAL

Lemko demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: October 19, 2023

*s/ Aaron Frankel*
Aaron Frankel (*pro hac vice*)
**KRAMER LEVIN NAFTALIS**
 **& FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-7793
afrankel@kramerlevin.com

Paul Andre (*pro hac vice*)
Lisa Kobialka (*pro hac vice*)
James Hannah (*pro hac vice*)
**KRAMER LEVIN NAFTALIS**
 **& FRANKEL LLP**
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650)- 752-1700
Facsimile: (650) 752-1800
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com

Jon B. Hyland (Bar Number: 24046131)
jhyland@hilgersgraben.com
Grant Schmidt (Bar. Number: 24084579)
gschmidt@hilgersgraben.com
**HILGERS GRABEN PLLC**
7859 Walnut Hill Lane, Suite 335
Dallas, TX 75230
Telephone: 972-645-3097

*Attorneys for Plaintiff*
Lemko Corporation

## CERTIFICATE OF SERVICE

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are served with a copy of this document via the Court's CM/ECF System on October 29, 2023.

*s/ Aaron Frankel*
Aaron Frankel
